2019 IL App (4th) 160818

NO. 4-16-0818

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 1, 2019
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| CHRISTOPHER JAMES HINTHORN, | ) | No. 14CF1469 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Robert L. Freitag, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court, with opinion.
Justices Steigmann and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1        In June 2016, a jury found defendant, Christopher James Hinthorn, guilty of predatory criminal sexual assault and criminal sexual assault. The trial court sentenced him to consecutive 18-year prison terms on three counts of predatory criminal sexual assault and imposed separate sexual assault and sex offender fines.

¶ 2        On appeal, defendant argues (1) the trial judge should have recused himself, (2) the judge improperly admitted evidence, (3) the State failed to prove him guilty beyond a reasonable doubt, and (4) the judge erred in the imposition of various fines. We affirm the trial court's judgment and remand so defendant may file a motion regarding his fines pursuant to Illinois Supreme Court Rule 472 (eff. May 17, 2019).

¶ 3                                    I. BACKGROUND

¶ 4        In December 2014, a grand jury indicted defendant on three counts of predatory

criminal sexual assault of a child (counts I, V, and VII) (720 ILCS 5/11-1.40(a)(1) (West 2012)), alleging defendant, being over 17 years of age, knowingly committed an act of sexual penetration involving his penis and R.H.'s vagina when R.H. was under 13 years of age. The State alleged defendant committed the offenses between April 1, 2005, and April 1, 2006 (count I), and between April 2, 2006, and April 1, 2011 (count V). The State later amended the indictment to allege defendant committed the offenses set forth in count VII between April 1, 2005, and April 1, 2012.

¶ 5        The grand jury indicted defendant on the offense of predatory criminal sexual assault based on an accountability theory (count III), alleging defendant, or one for whose conduct he was legally accountable, being over the age of 17, knowingly committed an act of sexual penetration involving the tongue of H.H. and R.H.'s vagina when R.H. was under 13 years of age. The State alleged defendant committed the offense set forth in count III between April 1, 2005, and April 1, 2006.

¶ 6        The grand jury also indicted defendant on four counts of criminal sexual assault (counts II, IV, VI, and VIII) (720 ILCS 5/11-1.20(a)(3) (West 2012)). Count II alleged, between April 1, 2005, and April 1, 2006, defendant knowingly committed an act of sexual penetration with R.H., a person under the age of 13, the act involved defendant's penis and R.H.'s vagina, and defendant was a family member of R.H. Count IV alleged, between April 1, 2005, and April 1, 2006, defendant, or one for whose conduct he was legally accountable, knowingly committed an act of sexual penetration with R.H., a person under the age of 18, the act involving H.H.'s tongue and R.H.'s vagina, and defendant was a family member of R.H.

¶ 7        Counts VI and VIII alleged defendant knowingly committed an act of sexual penetration with R.H., a person under the age of 18, the act involved defendant's penis and R.H.'s vagina, and defendant was a family member of R.H. Count VI alleged defendant committed the

offense between April 2, 2006, and April 1, 2011. Although count VIII alleged defendant committed the offense between April 1, 2011, and April 1, 2012, the State later amended the count to allege he committed the offense between April 1, 2005, and April 1, 2012.

¶ 8                               A. Pretrial Motions

¶ 9                        1. *Motions for Substitution of Judge and Recusal*

¶ 10            In August 2015, defendant filed a motion for substitution of judge pursuant to section 114-5 of the Code of Criminal Procedure of 1963 (Procedure Code) (725 ILCS 5/114-5 (West 2014)). The motion alleged Judge Robert Freitag was the assistant state's attorney assigned to prosecute defendant on two counts of criminal sexual assault in McLean County case No. 97-CF-1189. The alleged victim in that case, H.H., who is defendant's ex-wife, was disclosed as a witness against him in the current case. The motion also alleged then-prosecutor Freitag signed an information in October 1998 charging defendant with domestic battery and later signed a plea agreement. Defendant argued that, "although no actual prejudice is alleged against Judge Robert Freitag[,] the scenario certainly could and probably does pose an appearance of impropriety." While the motion asked that Judge Freitag recuse himself, defense counsel later stated he was asking for the appointment of a new judge to make the determination on the motion.

¶ 11            Upon assignment, Judge Matthew J. Fitton conducted a hearing on defendant's motion for substitution of judge. Per defense counsel's request, Judge Fitton took judicial notice of McLean County case No. 97-CF-1189. Defense counsel argued, based on Judge Freitag's prior involvement with defendant's criminal case, he had knowledge of disputed evidentiary facts concerning the current proceeding and it would be improper for him to preside as judge.

¶ 12            Judge Fitton noted a judge's previous position as a prosecutor involving a supervisory position over the case is insufficient, standing alone, to establish cause for substitution.

He stated there had been "no showing that Judge Freitag has a personal bias or prejudice concerning a party" and Freitag's position as prosecutor, without more, was insufficient to grant the motion. Thus, Judge Fitton denied the motion and ordered the case to remain before Judge Freitag.

¶ 13          In October 2015, defendant filed a motion asking Judge Freitag to recuse himself under Illinois Supreme Court Rule 63(C) (eff. July 1, 2013). Based on Judge Freitag's previous involvement as a prosecutor in the prior charges against defendant and involving H.H., the motion claimed it could be necessary to interview Freitag as a potential witness who could impeach H.H.'s testimony at trial. Thus, "since there is a real possibility that Robert Freitag may be called or at least interviewed as to surrounding circumstances relevant to issues in this matter," defendant argued it would be appropriate for Freitag to disqualify himself from further involvement in the case.

¶ 14          In January 2016, Judge Freitag conducted a hearing on defendant's motion and took judicial notice of McLean County case No. 97-CF-1189. H.H. testified she was the named victim in the 1997 sexual assault indictments against defendant, who was her husband at the time. She had conversations with the prosecutor, Robert Freitag, but she did not recognize him at the hearing. She asked him to drop the charges against defendant, but Freitag declined to do so.

¶ 15          In his argument, defense counsel stated evidence would be presented in a future hearing on a motion *in limine* in which specific information from the 1997 case would be heard, which could impact Judge Freitag's ruling on the motion. Further, if H.H.'s testimony needed to be impeached, the defense might have an obligation to disclose Freitag as a witness for impeachment purposes.

¶ 16          Judge Freitag noted that, if a judge was a potential witness in a case in which he or

she was presiding, "recusal would be the appropriate remedy." While acknowledging he was the prosecutor in the prior case, Freitag stated he had "no independent recollection of the matter in 1997." He also stated, in part, as follows:

> "Prior to this issue being raised in this court, [defendant] had appeared in front of the court several times with the Public Defender. I did not realize that I had once prosecuted [defendant] during any of those hearings. I had no realization of that until these motions were brought. These motions relate to contacts between this court and the alleged victim in that case, [H.H.], who testified here today. I will say frankly that I was very relieved when she said she didn't recognize me because I didn't want to disrespect her by indicating that I don't recognize her either. She did testify that she believes that we met at one point, but what I think is very important here is that she also testified that other than her recollection that she asked me to drop the charges, she has no other recollection of what was discussed. She doesn't recall the specifics of what was discussed. She doesn't recall any reason she may have given for her request or anything further, and frankly, I have absolutely no memory of that meeting. I'm not saying it didn't take place. Not by any means am I suggesting that. But I have absolutely no memory of specifically individually speaking with [H.H.] about anything.
>
> The crux of the motion here today seems to be that this court, that I am a potential impeachment witness.

In order for me to be an impeachment witness, number one, [H.H.] would have to have some memory of statements she made, and I would have to have some memory of different statements or inconsistent statements that she made. Neither one of those are present in any of the evidence that the court has heard today because she has no recollection of what she said. I certainly have no recollection of meeting with her or anything she may have said if I did meet with her. So I don't see how I could possibly be called as an impeachment witness under those circumstances.

Now, [defense counsel] has suggested that if this—if I were not presiding in this case that he could provide me with information that may refresh my recollection on some of these points. Well, maybe yes, maybe no, I don't know. Certainly seeing her and hearing her testify that we met, that doesn't jog my memory at all. I have no recollection of meeting with her.

The only recollection I have of this case now that it has been brought to my attention is I have some vague recollection that I believe the victim recanted and that had something to do with how the case was resolved. Other than that—and I don't even know if that's correct, frankly. But I have some vague memory that that may have been something that occurred in this case. Maybe I'm confusing it with a different case. I don't even know—

SPECTATOR: No, it's the correct one.

THE COURT: Ma'am, ma'am, please be quiet.

So the court has no recollection of that either. So I don't know if that's correct or that's not correct. But that may be what happened in this case.

But the point I'm trying to make here is I don't know how I could possibly testify when I have no memory of anything being said to me that could possibly impeach this witness if she were a witness."

¶ 17     Referencing the pending pretrial motions, Judge Freitag stated that, if he had any knowledge of any facts relevant to those motions, he "wouldn't hesitate to recuse" and "would do it in a heartbeat" because he had "plenty of cases to fill [his] docket." As he had no recollection of the facts of defendant's prior case, Freitag denied the motion. He added that, if during the motion hearings he recalled "something that may or may not be relevant to impeachment" or remembered facts that could arise in this case, he "would obviously recuse immediately." Freitag also stated he was preparing to take an extended medical leave and a new judge would be hearing the motions.

¶ 18                                    2. *Other-Crimes Evidence*

¶ 19     In March 2015, the State filed a motion pursuant to section 115-7.3 of the Procedure Code (725 ILCS 5/115-7.3 (West 2014)) to admit testimony of other-crimes evidence involving the forcible vaginal penetration of H.H., a family or household member, after defendant had consumed alcohol.

¶ 20     Defendant filed a motion *in limine*, asking the trial court to prohibit the State from introducing at trial any evidence of unlawful or immoral acts perpetrated against H.H. by defendant during the course of their marriage or at any other time. Defendant claimed the State's discovery

included allegations from H.H. that defendant engaged in sexual activities with her that were against her will and those acts had no relevance to the pending charges.

¶ 21 The State also filed notice of its intent to use statements of R.H. to multiple witnesses pursuant to section 115-10 of the Procedure Code (725 ILCS 5/115-10 (West 2014)).

¶ 22 Judge Rebecca S. Foley conducted a hearing on the motions. On its section 115-10 motion, the State called P.H., who was 16 at the time of the hearing and a cousin of R.H., who was a year younger. P.H. testified regarding statements R.H. made about defendant touching her. J.H., P.H.'s mother, also testified regarding R.H.'s disclosures of sexual abuse. Judge Foley found three statements met the criteria of section 115-10 and allowed their use at trial.

¶ 23 In terms of the State's section 115-7.3 motion and defendant's motion *in limine*, both referring to defendant's sexual assaults on H.H., Judge Foley heard the parties' arguments and then recessed the hearing to watch video interviews of defendant and H.H. Thereafter, Foley acknowledged "some of those collateral offenses are acts of some probative value," but "the prejudicial effect does outweigh any potentially probative effect." Thus, Foley denied the State's section 115-7.3 motion and allowed defendant's motion *in limine*.

¶ 24 After the State filed a motion to reconsider the ruling on its section 115-7.3 motion, Judge Foley noted the parties could raise and address issues that arise during trial and that Judge Freitag could make a determination if information is appropriate as other-crimes evidence as opposed to evidence offered under section 115-7.3.

¶ 25 B. Jury Trial

¶ 26 Defendant's jury trial commenced in June 2016. R.H., born in 2000 and 16 years old at the time of trial, testified defendant is her father and H.H. is her mother. When she was "[a]round five" years old, defendant came into her bedroom and she remembered "feeling that

[her] pants were going down." With defendant on top of her, she remembered "pain and the smell of alcohol." She stated she felt pain in her "lower area." R.H. testified defendant's "lower part of the body" entered the front of hers. She thought she "passed out" because she did not "really remember anything else."

¶ 27    R.H. testified defendant engaged in similar conduct on "three or four" occasions. During the last occurrence, she was "seven or eight" years old. She stated the incidents always occurred in her bedroom and she did not remember anyone else being there. When she was 12 or 13 years old, R.H. stated she told her aunt and her cousin P.H. She also told her mother, her youth leader, and her boyfriend.

¶ 28    On cross-examination, R.H. testified she, her mother, and her brother moved out of the family home in 2009. She spoke with her youth leader, Candi Evans, in 2014, and then met with a representative of the Department of Children and Family Services (DCFS) and a police officer. She later spoke with Mary Whitaker at the Children's Advocacy Center. When asked by defense counsel whether she remembered telling Whitaker that the first incident occurred on her bed, R.H. remembered saying it occurred on the floor because "there was a mattress on the floor." She stated she was wearing Pink Panther pajamas at the time. Defendant pulled her pants down to her knees. She recalled seeing blood on her pajamas the next day, although she did not think she mentioned it to Whitaker. R.H. stated the incidents stopped when she moved out of the house in 2009. She also stated she did not tell Evans that the last time defendant touched her inappropriately was within a year of her conversation with Evans.

¶ 29    Dr. Helen Appleton, a clinical psychologist, testified as an expert in disclosure of child sexual abuse. She stated "very few children disclose" their experiences of sexual abuse "right away." When delayed disclosure occurs, it is often made to a peer or the nonoffending parent after

a triggering event and in a piecemeal fashion.

¶ 30 Maureen Hofmann testified as an expert in childhood sexual abuse trauma. When asked if a child were abused three or four times over the course of several years and made a delayed disclosure months after the last instance of abuse, would she expect to see any evidence of trauma, Hofmann opined she "would be surprised" to find any evidence because, outside a 72-hour window, 95% of the exams are normal.

¶ 31 Candi Evans, a youth minister at Heyworth Christian Church, testified she participated in a service in November 2014 in which families were discussed. She noticed R.H. became "visibly upset" and began crying. After the service and in Evans's office, R.H. was still "very upset" and "sobbing."

¶ 32 P.H., R.H.'s cousin, testified she and R.H. grew up and played together. When P.H. was between the ages of 8 and 12, she and R.H. were on the swings at a park near P.H.'s house. At the time, P.H. "knew what sex was," as her mother "had the talk with" her, and R.H. had "been showing signs that something was wrong with her." P.H. asked if defendant "had touched her sexually in any sort of way." R.H. "didn't give [P.H.] a direct answer," but what she did say pointed in that direction. P.H. stated R.H. stuttered, became "emotional and upset," and eventually said "yes."

¶ 33 P.H. later told her mother that a "friend" made the disclosure. When her mother asked if the "friend" was R.H., P.H. "got upset and started crying." P.H. and her mother went to R.H.'s house and picked her up. P.H. "hinted on the conversation that we had at the park to see if she would talk." R.H. started "bawling" and became "really upset." Eventually, after being asked if defendant touched her in any way, R.H. said he had without giving more detail.

¶ 34 On cross-examination, P.H. believed the conversation she had with R.H. took place

in summer 2010, which was after defendant and H.H. split up in November 2009. When R.H. was asked if her mother had known about defendant's touching, R.H. said she did know.

¶ 35    J.H., R.H.'s aunt, testified R.H. was seven or eight years old when she disclosed defendant's touching. After P.H. told her that R.H. had been abused, J.H. and P.H. talked with R.H., who confirmed she had been abused by defendant. J.H. stated R.H. was "upset and she didn't want to talk about it." R.H. did not elaborate but "bottled up more and more and more." After dropping off R.H., J.H. returned home and called H.H. J.H. did not call the police because she was unsure if R.H. "knew what sex was" and J.H. did not know "what exactly had happened." She also recalled a phone conversation in which R.H. said not to tell her mother.

¶ 36    Bloomington police detective John Heinlen testified he specialized in investigating sex crimes. He watched an interview of R.H. conducted by Mary Whitaker in December 2014. He later interviewed H.H. at the police station, and she admitted her involvement in R.H.'s abuse. Thereafter, Heinlen and DCFS investigator Molly Mintus conducted an interview with defendant that lasted approximately six hours. Upon initial questioning, defendant stated he could not remember if he ever had sex with his wife in their daughter's bedroom. Later, defendant stated they had probably had sex in their bedroom with R.H. present. Defendant admitted being a "very heavy drinker," sometimes consuming 15 to 16 beers per night, and he drank to the point where he did not remember. When Heinlen told defendant that H.H. had admitted she was present and performed oral sex on R.H. while defendant was having sex with H.H., defendant denied being present. When confronted with R.H.'s allegations, defendant was "[p]retty cold."

¶ 37    H.H. testified she and defendant were married in June 1995 when she was 18 years old. During the marriage, their sex life included role-playing games, including "daddy-daughter" and a "little bit of everything." After R.H. was born, defendant "started accusing [H.H.] of having

sex with her." H.H. stated these accusations were made "very frequently," anywhere from two to four times a week. Defendant did not express anger at her doing it; instead, he was angry that H.H. "would not let him participate." Later, defendant indicated his desire to have sex with R.H. when she was approximately six or seven years old.

¶ 38    H.H. related an incident with defendant that took place during "the middle of the night" when R.H. was approximately five years old.

> "She was in bed asleep. I wanted to go to bed. He wanted to do more than that. He wanted to go into her room and have sex with her. He made me go in there. Implying that if I didn't, he was going to beat me and have me arrested. And he made me take off her clothes and get between her legs. And he wanted me to perform oral sex on her while he had sex with me."

H.H. stated she went into R.H.'s room and removed R.H.'s pajama pants. While H.H. was on her hands and knees, defendant was on his knees having sex with her. H.H. attempted to have oral sex with R.H., stating she touched her tongue to her vagina one time before wanting to throw up. Because her hair was in the way, defendant became angry because he could not see the act. H.H. refused defendant's demand to do it again. H.H. testified she did not recall R.H. moving or waking up during the incident.

¶ 39    H.H. testified she left defendant around Thanksgiving 2009. She did not leave at the time of the described incident because defendant claimed to have proof that she molested the children. During the marriage, defendant drank "[a]t least a 12 pack a day" and "[m]ore on the weekend."

¶ 40    When R.H. was approximately 11 or 12 years old, H.H. picked up her daughter

from a friend's house when the friend's mother said that R.H. " 'told me that her dad raped her.' " After later questioning R.H. if something happened between her and defendant, R.H. said " 'dad molested me *** [a] long time ago.' " R.H. stated she did not want to talk about it.

¶ 41 A "couple months later," R.H. returned home after being with her cousin P.H. H.H. received a call from J.H. stating defendant had raped R.H. H.H. stated she knew and then talked with R.H., who stated " 'dad raped me.' " R.H. again stated she did not want to talk about it and did not want them to go to the police.

¶ 42 On cross-examination, H.H. testified she had not made a formal report to DCFS or any police agency prior to being contacted by Candi Evans and DCFS around Thanksgiving 2014. She did not recall telling Evans, after Evans stated a report to authorities would have to be made following R.H.'s disclosure, that "it doesn't matter, they already know." H.H. stated it would have been a lie if she said that.

¶ 43 H.H. claimed she never forced R.H. to visit defendant and supported her when she came up with excuses not to do so. H.H. sought an order of protection in October 2014 and asked for visitation to be canceled. After failing to get the visitation canceled, H.H. told R.H. that if R.H. did not visit defendant, H.H. could go to jail for failing to abide by a court order. Upon hearing this, R.H. "had a meltdown."

¶ 44 H.H. recalled telling Detective Heinlen and investigator Mintus that she did not know anything about sexual abuse during the divorce proceedings. She also told them she "would rather take a beating with a leather belt than have sex with [her] daughter." When asked by investigators if defendant ever tried to force her to engage in sexual activity with R.H., H.H. told them he "tried multiple times."

¶ 45 When investigators asked whether defendant forced her to do anything with R.H.,

H.H. stated she did not recall. H.H. described her answers as "hedging," stating they were "not completely honest answers at that moment" because she was afraid. During cross-examination, the following exchange took place between H.H. and defense counsel:

"Q. Detective Heinlen was specifically asking questions about whether or not you had been forced by your husband to engage in sexual activity with your daughter at this stage of the interview, correct?

A. I don't know.

Q. Do you remember Detective Heinlen saying to you, 'Do you understand that people could—that this could be understood by people,' saying, 'I would hope so,' when talking about your sexual activity with your daughter?

A. Yeah.

Q. And do you remember Heinlen at that point in time saying, 'I'm here to tell you it could be. I'm going to ask in a nonjudgmental way. Did he ever force you to do anything with [R.H.],' and that you paused and said, 'I don't remember'? Do you remember saying that in response to that question?

A. Yeah.

Q. That wasn't true either, was it?

A. No."

¶ 46 Following H.H.'s cross-examination, the State reminded the trial court about Judge Foley's prior ruling in regard to section 115-7.3 and the prior instances of sexual assault against

- 14 -

H.H. by defendant. The State argued defense counsel had "opened the door to that" through Heinlen's questioning of H.H., stating "[t]he entire context of that portion of the interview entirely circled around instances [of H.H.] reporting being raped by this defendant. That if she didn't do what he said, he would rape her and beat her." The State contended evidence of defendant's sexual assault of H.H. "would appropriately be offered for the witness' state of mind when she entered that room as to why she felt forced to do that in response to counsel's questioning."

¶ 47    Defense counsel argued Judge Foley's ruling was the law of the case and disagreed that the door had been opened. Counsel believed the State had established there was domestic abuse in the home, which explained H.H.'s fear and why she did not call the authorities.

¶ 48    Judge Freitag stated he was not reviewing Judge Foley's ruling, only considering the State's request based on the testimony presented at trial. He ruled, in part, as follows:

> "The issue here now, is there a limited purpose of this evidence to help explain those things that [defense counsel] was bringing out on cross-examination regarding some of those questions and the answers she gave. And I think, clearly, that the door has been opened for that. And I think I will allow that evidence to come in in a limited fashion for a limited purpose. And I will instruct the jury that they are to consider this evidence only for the limited purpose of explaining the witness' state of mind and not as any evidence of the defendant's guilt of these offenses. They are to consider it only for that purpose."

Freitag further clarified that the instruction would focus on H.H.'s state of mind in a general sense.

¶ 49    On redirect examination and following the trial court's instruction to the jury, the

prosecutor asked H.H. if there was abuse at the hands of defendant beyond physical beatings. H.H. said there had been such instances, including "[m]ore than one" rape.

¶ 50        After H.H.'s testimony, the State asked to call Detective Heinlen for the limited purpose of asking him whether defendant admitted raping H.H. Defense counsel objected, arguing defendant's statements would not go to H.H.'s state of mind and would fall under Judge Foley's ruling that the alleged sexual assaults were inadmissible.

¶ 51        Judge Freitag noted he was "very hesitant to go any further down this road at this point in time because that evidence [has] already been presented to the jury by [H.H.]" He also stated as follows:

> "But it is also clear to me from opening statements, from cross-examination of various witnesses, including, obviously, [H.H.], that the crux of the defense is, in fact, being suggestive that [H.H.] is sort of the motivation behind these allegations and that they are untrue. And therefore, I do believe that the probative value of this evidence is somewhat raised.
>
> And while it's a very close balance, given that the State is going to limit it basically to a single question and nothing further, I am going to allow it over objection.
>
> I, again, will instruct the jury prior to the question being asked that it's being offered only for the limited purpose for the state of mind of the witness, [H.H.], and not for any other purpose."

¶ 52        After recalling Detective Heinlen, the State asked him whether defendant admitted over the course of his marriage with H.H. that he raped her multiple times. Heinlen stated

defendant did make that admission. Following Heinlen's testimony, the State rested.

¶ 53      Called as a witness by the defense, Candi Evans testified regarding her conversation with R.H. in November 2014. When the subject of physical abuse arose, Evans asked R.H. whether the abuse happened recently. R.H. eventually indicated the abuse had occurred within the last year. Since she was a mandatory reporter, Evans told R.H. and later H.H. that she would have to notify DCFS. H.H. said DCFS already knew about the abuse.

¶ 54      Defense counsel then recalled Detective Heinlen and questioned him about his interview of H.H. in December 2014. H.H. did not mention J.H. as being someone who talked to her about R.H.'s abuse. When asked about the allegation of oral sex having been performed on R.H. and who undressed her, H.H. stated she thought defendant undressed R.H. H.H. also stated she thought R.H. was awake during the incident and she placed a blanket over R.H.'s face.

¶ 55      Following closing arguments, the jury found defendant guilty on the allegations regarding contact between him and R.H. (counts I, II, V, VI, VII, and VIII) but not guilty on counts related to H.H. and R.H. (counts III and IV).

¶ 56      In August 2016, defense counsel filed a motion for judgment of acquittal or, in the alternative, a new trial. Counsel argued, *inter alia*, that Judge Freitag erred in (1) not recusing himself, (2) allowing H.H. to testify about the alleged forcible rapes committed by defendant, and (3) allowing Detective Heinlen to testify about defendant's statements admitting he raped H.H. Judge Freitag denied the motion.

¶ 57      The trial court entered convictions on counts I, V, and VII. On each count, the court sentenced defendant to consecutive 18-year prison terms for a total of 54 years. The court also imposed separate sexual assault fines ($200) and sex offender fines ($500) for each conviction. Defense counsel filed a motion to reconsider the sentence, claiming it was excessive. The court

denied the motion. This appeal followed.

¶ 58                              II. ANALYSIS

¶ 59                              A. Recusal

¶ 60        Defendant argues Judge Freitag should have recused himself from the case under Illinois Supreme Court Rule 63(C) (eff. July 1, 2013). We disagree.

¶ 61        Along with a motion for a substitution of judge under section 114-5 of the Procedure Code (725 ILCS 5/114-5 (West 2014)), a defendant may also file a motion to recuse pursuant to Illinois Supreme Court Rule 63(C)(1) (eff. July 1, 2013). See *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 43, 958 N.E.2d 647. Our supreme court has noted "recusal and substitution for cause are not the same thing." *O'Brien*, 2011 IL 109039, ¶ 45. "Unlike a motion for substitution of judge, a motion for recusal does not trigger a duty on the part of the trial judge to transfer the motion to another judge for determination." *Kamelgard v. American College of Surgeons*, 385 Ill. App. 3d 675, 681, 895 N.E.2d 997, 1003 (2008); see also *People v. Klein*, 2015 IL App (3d) 130052, ¶ 84, 40 N.E.3d 720.

¶ 62        Illinois Supreme Court Rule 63(C)(1) directs a judge to voluntarily recuse himself where his impartiality may reasonably be questioned, including when he "has a personal bias or prejudice concerning a party *** or personal knowledge of disputed evidentiary facts concerning the proceeding," has "served as a lawyer in the matter in controversy," is known "to have more than a *de minimis* interest that could be substantially affected by the proceeding," or is "likely to be a material witness in the proceeding." Ill. S. Ct. R. 63(C)(1)(a), (b), (e)(iii), (e)(iv) (eff. July 1, 2013). Additionally, "Rule 63(C)(1)'s direction to judges to voluntarily recuse themselves where their 'impartiality might reasonably be questioned' [citation] includes 'situations involving the appearance of impropriety.' " *O'Brien*, 2011 IL 109039, ¶ 43.

¶ 63          "Judges, of course, are presumed impartial, and the burden of overcoming the presumption by showing prejudicial trial conduct or personal bias rests on the party making the charge." *O'Brien*, 2011 IL 109039, ¶ 31. Our supreme court has stated " '[m]erely having a previous involvement with a defendant does not, *per se*, require disqualification.' " *People v. Storms*, 155 Ill. 2d 498, 503, 617 N.E.2d 1188, 1190 (1993) (quoting *People v. Del Vecchio*, 129 Ill. 2d 265, 277, 544 N.E.2d 312, 318 (1989)). We note "the trial judge is in the best position to determine whether he or she is prejudiced against the defendant when presented with a motion for recusal." *People v. Antoine*, 335 Ill. App. 3d 562, 570, 781 N.E.2d 444, 452 (2002). "When reviewing a trial judge's recusal decision, we must determine whether the decision was an abuse of the judge's discretion." *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 175, 886 N.E.2d 976, 983 (2008); *People v. Kliner*, 185 Ill. 2d 81, 169, 705 N.E.2d 850, 894 (1998).

¶ 64          In his brief, defendant argues Judge Freitag's failure to disqualify himself from this case constituted judicial misconduct violating both due process and Rule 63(C). Initially, we note defendant did not raise a due process argument in his motion for recusal or in his posttrial motion. Thus, his argument is forfeited. See *People v. Hestand*, 362 Ill. App. 3d 272, 279, 838 N.E.2d 318, 324 (2005) (a defendant must object at trial and raise the issue in a posttrial motion to preserve the issue for review). He did, however, raise his objection pursuant to Rule 63(C).

¶ 65          Defendant contends Judge Freitag should have disqualified himself because (1) his impartiality could reasonably be questioned given his lead role in prosecuting defendant on other sexual abuse allegations against a family member, (2) he had personal knowledge of evidentiary facts in the prior case and could have been a material witness in the current one, (3) he served as a lawyer in the matter in controversy since the 1997 allegations became central to the prosecution in this case, and (4) the prior prosecution gave him more than a *de minimis* interest that could be

substantially affected by the proceeding.

¶ 66    At the hearing on the motion, Judge Freitag stated he had "no independent recollection of the matter in 1997." He stated he had not realized he had once prosecuted defendant until the motions were filed. He also stated he did not recognize H.H. or remember meeting with her, and she could not recall the specifics of any prior meeting between them. Given the fact he had no memory of any statements she made, Freitag did not see how he "could possibly be called as an impeachment witness under those circumstances." He continued as follows:

> "The only recollection I have of this case now that it has been brought to my attention is I have some vague recollection that I believe the victim recanted and that had something to do with how the case was resolved. Other than that—and I don't even know if that's correct, frankly. But I have some vague memory that that may have been something that occurred in this case. Maybe I'm confusing it with a different case. I don't even know—
>
> SPECTATOR: No, it's the correct one.
>
> THE COURT: Ma'am, ma'am, please be quiet.
>
> So the court has no recollection of that either. So I don't know if that's correct or that's not correct. But that may be what happened in this case.
>
> But the point I'm trying to make here is I don't know how I could possibly testify when I have no memory of anything being said to me that could possibly impeach this witness if she were a witness.

*** [I]f the court has any knowledge of those facts that may be relevant in those motion hearings, then I wouldn't hesitate to recuse. I would do it in a heartbeat. I have plenty of cases to fill my docket. I would have absolutely no hesitation in doing that. It would be the right thing to do. But again, because I have absolutely no recollection of any of that or what those facts are or what they may be and nothing has been sparked by seeing [H.H.] or hearing her today, so again, I just don't see a basis for the court to recuse when there is absolutely no memory or any facts related to these cases."

¶ 67 We find defendant has failed to overcome the presumption of impartiality on the part of Judge Freitag. Defendant makes only conclusory claims without any basis in the record or law in support. Defendant claims Freitag "had personal knowledge of the evidentiary facts" in the prior case, even though Freitag himself stated he had nothing more than a vague recollection of the outcome of that case. Defendant claims Freitag " 'serv[ed] as [a] lawyer in the matter in controversy,' " but "the phrase 'matter in controversy' has been held to encompass the case currently pending before the court." See *Storms*, 155 Ill. 2d at 504 (quoting Ill. S. Ct. R. 63(C)(1)(b) (eff. Nov. 25, 1987)); see also *People v. Phinney*, 250 Ill. App. 3d 858, 861, 620 N.E.2d 444, 446 (1993). Defendant also argues Freitag's prior prosecution of defendant "demonstrates his strong interest in overseeing a successful felony prosecution in this case." Defendant would have us start from the premise that Freitag's integrity, impartiality, and candidness must be questioned simply by his prior position as a prosecutor. Such is not the law. It is defendant's burden to overcome the presumption of impartiality, and he offers nothing more than speculation and conjecture that Freitag's work nearly 20 years prior on a separate case involving a different victim would prejudice

- 21 -

him in his current trial. As defendant failed to meet his burden, we find Judge Freitag did not err in denying the motion.

¶ 68                                B. Prior Rape Allegations

¶ 69        Defendant argues the trial court improperly admitted evidence of prior rape allegations against him on the basis the evidence demonstrated H.H.'s state of mind. We disagree.

¶ 70        In his brief, defendant contends Judge Freitag erroneously permitted the State to introduce evidence of prior sexual assault allegations against him during trial, which created a mini-trial on those other crimes and prejudiced the jury against him because of his prior bad acts. Further, defendant argues Freitag's ruling undermined Judge Foley's denial of the State's pretrial motion to admit such accusations. Defendant also argues Freitag's reasoning for admitting the evidence—to demonstrate H.H.'s state of mind—was not a proper basis for admission and did not overcome the extreme prejudice the evidence caused.

¶ 71        The State argues the subject testimony was admissible for any one or all of three reasons—curative admissibility, the doctrine of completeness, and as other-crimes evidence.

> "Under the doctrine of curative admissibility, in a criminal case, if the defendant on cross-examination opens the door to a particular subject, the State on redirect examination may question the witness to clarify or explain the subject brought out during, or remove or correct any unfavorable inferences left by, the defendant's cross-examination, even if this elicits evidence that would not be proper or admissible. [Citations.] The doctrine is protective, and only shields a party from unduly prejudicial inferences raised by the other side." *People v. Mandarino*, 2013 IL

- 22 -

App (1st) 111772, ¶ 29, 994 N.E.2d 138.

Curative admissibility falls within the exception to the general inadmissibility of other-crimes evidence, which recognizes evidence of other offenses to be admitted where it is "procured, invited, or acquiesced to by the defendant." *People v. McGee*, 268 Ill. App. 3d 582, 586, 645 N.E.2d 329, 332 (1994). The doctrine allows a party under limited circumstances to "present inadmissible evidence when necessary to cure undue prejudice resulting from an opponent's introduction of similar evidence." 1 Justice Robert J. Steigmann & Lori A. Nicholson, Illinois Evidence Manual § 4:25, at 229 (4th ed. Supp. 2017-18).

¶ 72        Here, the defense precluded the State from introducing evidence of other rapes through its successful motion *in limine*. While cross-examining H.H. however, defense counsel asked about her earlier statements to investigators regarding being forced by defendant to perform a sexual act upon her own daughter. During direct examination and in obedience to the trial court's order, the State's direct examination of H.H. referenced statements about H.H.'s fear of being beaten if she did not comply. Although defense counsel, having won the pretrial motion, was aware H.H. said her fear of further rapes and beatings influenced her decision to succumb to defendant's demands, he sought to unfairly create the inference it was only H.H.'s fear of a beating which caused her to acquiesce. He then sought to impeach her by noting her statement to investigators she "would rather take a beating with a leather belt than have sex with my daughter," thereby implying a fear of a beating would not have been enough to force her to do defendant's bidding. This is the exact situation for which curative admissibility was created. Defense counsel sought to use the pretrial ruling to preclude the State from fully disclosing the bases for H.H.'s fear of defendant and then infer she should not be believed since she had already indicated to investigators the possibility of a beating alone would not have been enough to cause her to perform the act.

Discrediting H.H. was crucial to defendant's case since his defense was based, in large part, on the claim H.H. was the source of the fabricated allegations by R.H. and was the motivating force behind his prosecution.

¶ 73    Where a defendant sought to falsely imply the absence of physical evidence connecting him to a crime due to the trial court's ruling on a suppression motion, our supreme court held as follows:

> " 'There is no gainsaying that arriving at the truth is a fundamental goal of our legal system' [citation], and we consider that allowing the defense or prosecution to misrepresent to the jury the actual facts of the case is neither consistent with the proper functioning and continued integrity of the judicial system nor with the policies of the exclusionary rules." *People v. Payne*, 98 Ill. 2d 45, 51-52, 456 N.E.2d 44, 47 (1983).

¶ 74    Ultimately, admissibility "turns on a balancing of the need to rebut the inference raised against the risk of unfair prejudice that would be posed by the introduction of the rebutting evidence." Michael H. Graham, Graham's Handbook of Illinois Evidence § 103.4, at 16 (10th ed. 2010). "The decision to allow curative evidence lies within the sound discretion of the trial court." *Mandarino*, 2013 IL App (1st) 111772, ¶ 29.

¶ 75    Here, defendant sought to rely upon the trial court's exclusion of any references to previous sexual assaults in the State's case as a means to attack the credibility of one of the State's key witnesses. Thus, under the doctrine of curative admissibility, the State was permitted to point out how H.H.'s fears were grounded not only on beatings, but also rapes, by defendant.

¶ 76    The State's reliance on the doctrine of completeness as an additional or alternative

basis for admissibility of the previous rapes is misguided however. Illinois Rule of Evidence 106 (eff. Jan. 1, 2011) provides:

> "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."

¶ 77       As explained in the Illinois Evidence Manual, the "completeness doctrine" relates to a particular writing or utterance and allows the opposing party to introduce the remainder or as much as may be required to place the original reference in proper context. 1 Justice Robert J. Steigmann & Lori A. Nicholson, Illinois Evidence Manual § 4:25, at 230 (4th ed. Supp. 2017-18). "Under the common law completeness doctrine, the *remainder* of a writing, recording, or oral statement is admissible to prevent the jury from being mislead, to place the admitted evidence in context to convey its true meaning or to shed light on the meaning of the admitted evidence." (Emphasis in original.) *People v. Kraybill*, 2014 IL App (1st) 120232, ¶ 65, 14 N.E.3d 1131.

¶ 78       Here, the State did not refer to any other portion of H.H.'s statements to investigators but instead asked whether in addition to the beatings she had been subjected to other abuse by defendant. H.H. said there had been instances of "more than one" rape. This was not an effort to rely upon other portions of H.H.'s statement to place defense counsel's questions and inference he sought to draw in proper context. Had the State done so, the completeness doctrine would have permitted it. By referring to the actual instances themselves, as opposed to their reference in her statement, the State's questions precluded application of the completeness doctrine.

¶ 79    Evidence of other crimes is generally inadmissible to show a defendant's propensity to commit the charged criminal conduct. *People v. Donoho*, 204 Ill. 2d 159, 170, 788 N.E.2d 707, 714 (2003). Such evidence, while relevant, is excluded because it "has 'too much' probative value." *Donoho*, 204 Ill. 2d at 170 (quoting *People v. Manning*, 182 Ill. 2d 193, 213, 695 N.E.2d 423, 432 (1998)). Moreover, a "[d]efendant is entitled to have his guilt or innocence evaluated solely on the basis of the charged crime." *Donoho*, 204 Ill. 2d at 170. "If other crimes evidence is admitted, it should not lead to a mini-trial of the collateral offense; the court should carefully limit the details to what is necessary to illuminate the issue for which the other crime was introduced." *People v. Nunley*, 271 Ill. App. 3d 427, 432, 648 N.E.2d 1015, 1018 (1995); see also *People v. Bedoya*, 325 Ill. App. 3d 926, 938, 758 N.E.2d 366, 377 (2001) (stating the other-crimes evidence "must not become a focal point of the trial").

¶ 80    "Evidence of other offenses may be admissible to demonstrate 'motive, intent, identity, absence of mistake, *modus operandi*, or any other relevant fact other than propensity.' " *People v. Smith*, 2015 IL App (4th) 130205, ¶ 21, 29 N.E.3d 674 (quoting *People v. Vannote*, 2012 IL App (4th) 100798, ¶ 37, 970 N.E.2d 72). Moreover, "[o]ther-crimes evidence is admissible if it is part of a continuing narrative of the event giving rise to the offense, intertwined with the charged offense, or explains an aspect of the charge which would otherwise be implausible or inexplicable." *People v. Patterson*, 2013 IL App (4th) 120287, ¶ 58, 2 N.E.3d 642. "Where other-crimes evidence is offered for a permissible purpose, such evidence will not be admitted if its prejudicial impact outweighs its probative value." *Patterson*, 2013 IL App (4th) 120287, ¶ 59.

¶ 81    A trial court's decision to admit other-crimes evidence will not be reversed on appeal absent an abuse of discretion. *Donoho*, 204 Ill. 2d at 182. "An abuse of discretion has occurred when the trial court's decision is arbitrary, fanciful, or unreasonable or when no

reasonable person would take the position adopted by the trial court." *People v. Wilson*, 2015 IL App (4th) 130512, ¶ 75, 44 N.E.3d 632.

¶ 82        As stated, Judge Foley denied the State's section 115-7.3 motion to admit other-crimes evidence and granted defendant's motion to bar evidence of his sexual assaults of H.H. On direct examination, H.H. described how defendant "made [her] go in" R.H.'s bedroom, "[i]mplying that if [she] didn't he was going to beat [her] and have [her] arrested." She also related how defendant made her take off R.H.'s clothes, get between her legs, and told her to perform oral sex on R.H. while he had sex with H.H. H.H. testified she touched her tongue to R.H.'s vagina. When asked why she did it, H.H. stated she "was afraid of getting beaten again."

¶ 83        On cross-examination, defense counsel questioned H.H. about her December 2014 interview with Heinlen and Mintus. H.H. testified she told them in that interview that defendant tried to force her to have sex with R.H. but H.H. said no. Asked if she told them "I would rather take a beating with a leather belt than have sex with my daughter," she responded "[t]hat did happen and, yes, I told them that." When investigators asked whether defendant forced her to do anything with R.H., H.H. stated she did not recall. H.H. described her answer as "hedging," stating they were "not completely honest answers at that moment" because she was afraid. The following exchange took place between H.H. and defense counsel:

> "Q. Detective Heinlen was specifically asking questions
> about whether or not you had been forced by your husband to engage
> in sexual activity with your daughter at this stage of the interview,
> correct?
>
> A. I don't know.
>
> Q. Do you remember Detective Heinlen saying to you, 'Do

you understand that people could—that this could be understood by people,' saying, 'I would hope so,' when talking about your sexual activity with your daughter?

A. Yeah.

Q. And do you remember Heinlen at that point in time saying, 'I'm here to tell you it could be. I'm going to ask in a nonjudgmental way. Did he ever force you to do anything with [R.H.],' and that you paused and said, 'I don't remember'? Do you remember saying that in response to that question?

A. Yeah.

Q. That wasn't true either, was it?

A. No."

Counsel then questioned her regarding whether she remembered telling Heinlen about how defendant "made" her go into R.H.'s room and tried to "make" H.H. perform oral sex on her but she could not do it and that H.H. did not remember whether she actually touched R.H.

¶ 84    On redirect examination and following the trial court's instruction to the jury, the prosecutor asked H.H. if there had been abuse at the hands of defendant beyond physical beatings. H.H. said there had been such instances, including "[m]ore than one" rape. After recalling Detective Heinlen, the State asked whether defendant admitted raping H.H. multiple times during the course of his marriage. Heinlen stated defendant did make that admission.

¶ 85    Given defense counsel's questioning that opened the door to H.H.'s state of mind, the evidence of defendant's sexual assaults of H.H. during the marriage was relevant to show why she committed the otherwise implausible and inexplicable act of licking her five-year-old

daughter's vagina. The evidence thus showed H.H.'s state of mind and explained why she felt compelled to engage in the sex act, *i.e.*, her fear of being raped by defendant. While H.H. was unable to mention the sexual assaults during direct examination due to Judge Foley's pretrial rulings, the State's questions on redirect examination and questions to Detective Heinlen properly placed her answers to defense counsel on cross-examination in context.

¶ 86         We note Judge Freitag gave thoughtful consideration to the possible prejudice the proposed evidence could have on the outcome of the case. Before H.H. gave the subject testimony, Freitag instructed the jury that the evidence was being offered for the limited purpose of explaining H.H.'s state of mind and was not to be considered for any other purpose, including whether defendant was guilty on the charged offenses. Freitag gave a similar instruction after Heinlen's testimony and after closing arguments. By limiting the questions asked and by instructing the jury on the limited purpose of the testimony, Freitag limited any prejudice the testimony could have had. Thus, we find no error in the limited admission of the other-crimes evidence.

¶ 87                    C. Sufficiency of the Evidence

¶ 88         Defendant argues the State failed to prove him guilty beyond a reasonable doubt of committing three separate acts of sexual penetration involving R.H. between 2005 and 2012, where the only testimony adduced at trial failed to specify the time, manner, and location of two of the alleged acts. We disagree.

¶ 89         " 'When reviewing a challenge to the sufficiency of the evidence in a criminal case, the relevant inquiry is whether, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Ngo*, 388 Ill. App. 3d 1048, 1052, 904 N.E.2d 98, 102 (2008) (quoting *People v. Singleton*, 367 Ill. App. 3d 182, 187, 854 N.E.2d 326, 331 (2006)). The trier of

fact has the responsibility to determine the credibility of witnesses and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from that evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81, 903 N.E.2d 388, 406 (2009). When considering the sufficiency of the State's evidence, the reviewing court does not retry the defendant. *People v. Beauchamp*, 241 Ill. 2d 1, 8, 944 N.E.2d 319, 322 (2011). Instead, "[a] conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094, ¶ 67, 23 N.E.3d 325.

¶ 90        To sustain a defendant's conviction for predatory criminal sexual assault of a child under section 11-1.40(a)(1) of the Criminal Code of 2012 (720 ILCS 5/11-1.40(a)(1) (West 2012)), the State must show (1) the defendant is 17 years of age or older, (2) he committed an act of sexual penetration, and (3) the victim was under 13 years of age. " 'Sexual penetration' means any contact, however slight, between the sex organ or anus of one person and an object or the sex organ, mouth, or anus of another person ***." 720 ILCS 5/11-0.1 (West 2012).

¶ 91        In this case, defendant argues the State's evidence failed to show he engaged in three separate sexual acts involving R.H., there was no physical proof of sexual penetration, and R.H. only provided vague testimony that could possibly support one conviction.

¶ 92        At trial, R.H., born in 2000, testified she was "[a]round five" years old when defendant came into her bedroom during the night. She remembered feeling "fear" and being on her back on her bed, which was a mattress on her bedroom floor. Then she began "feeling that [her] pants were going down" and, with defendant on top of her, she smelled alcohol and felt pain in her "lower area." R.H. stated defendant's "lower part of the body" entered the front of hers and the pain was "pretty bad." She thought she "passed out" because she did not "really remember

anything else." She remembered wearing Pink Panther pajamas and seeing blood on them the next day.

¶ 93        While no physical evidence was presented, Hofmann testified it was not surprising to find a lack of evidence of trauma due to the delayed disclosure. See *People v. Willer*, 281 Ill. App. 3d 939, 948-49, 667 N.E.2d 708, 715 (1996) (stating "there is no requirement that a victim's testimony be corroborated by medical evidence to sustain a conviction for criminal sexual assault"). R.H.'s testimony clearly described penetration of her vagina by defendant's penis, even though she did not use the names of those body parts, and thus the State's evidence was sufficient to establish beyond a reasonable doubt defendant's guilt of that sexual assault. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228, 920 N.E.2d 233, 242 (2009) (stating "the testimony of a single witness, if positive and credible, is sufficient to convict").

¶ 94        While admitting R.H. described one incident of sexual misconduct, defendant argues she failed to specify the time, manner, or location of the two other alleged incidents. Our supreme court has recognized "it is often difficult in the prosecution of child sexual abuse cases to pin down the times, dates, and places of sexual assaults, particularly when the defendant has engaged in a number of acts over a prolonged period of time." *People v. Bishop*, 218 Ill. 2d 232, 247, 843 N.E.2d 365, 374 (2006); see also *People v. Guerrero*, 356 Ill. App. 3d 22, 27, 826 N.E.2d 485, 489 (2005) (stating "[t]he date of the offense is not an essential factor in child sex offense cases"); *People v. Olivieri*, 334 Ill. App. 3d 311, 317, 778 N.E.2d 714, 718 (2002) (stating "the type of sexual penetration is not an element of the offense").

" 'The victim, of course, must describe *the kind of act or acts*

*committed* with sufficient specificity, both to assure that unlawful

conduct indeed has occurred and to differentiate between the various

- 31 -

types of proscribed conduct (*e.g.*, lewd conduct, intercourse, oral copulation or sodomy). Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (*e.g.*, "twice a month" or "every time we went camping"). Finally, the victim must be able to describe the *general time period* in which these acts occurred (*e.g.*, "the summer before my fourth grade," or "during each Sunday morning after he came to live with us") to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction.' " (Emphases in original.) *People v. Letcher*, 386 Ill. App. 3d 327, 334, 899 N.E.2d 315, 322 (2008) (quoting *People v. Jones*, 792 P.2d 643, 655-56 (Cal. 1990)).

¶ 95        Along with the previously addressed sexual assault, R.H. also testified the assaults occurred "more than two" times and "[p]robably just around three or four times." On each occasion, the assault took place in her bedroom and it involved, as described by the prosecutor and agreed to by R.H., the "lower body part in the front," which she acknowledged was the "private part of her body." She stated the assaults last occurred when she was seven or eight years old.

¶ 96        As stated, the trier of fact has the responsibility to determine the credibility of witnesses and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from that evidence. *Jackson*, 232 Ill. 2d at 280-81. The jury here could have

rationally concluded defendant committed acts of sexual penetration of R.H.'s vagina in her bedroom on three occasions when R.H. was between five and eight years old. Viewed in the light most favorable to the State, the evidence proved defendant's guilt of predatory criminal sexual assault beyond a reasonable doubt.

¶ 97                         D. Separate Sexual Assault Fines and Sex Offender Fines

¶ 98        Defendant argues the trial court erred in assessing separate sexual assault fines and sex offender fines for each conviction. We find remand is required.

¶ 99        While this case was pending on appeal, our supreme court adopted Illinois Supreme Court Rule 472 (eff. Mar. 1, 2019), which provides that the trial court retains jurisdiction to correct sentencing errors in the imposition or calculation of fines, fees, assessments, or costs at any time following judgment on the motion of any party. Moreover, Rule 472(c) states no appeal may be taken from a judgment of conviction on the ground of any sentencing error unless the error was first raised in the trial court. Subsequently, on May 17, 2019, Rule 472 was amended to provide that "[i]n all criminal cases pending on appeal as of March 1, 2019, or appeals filed thereafter in which a party has attempted to raise sentencing errors covered by this rule for the first time on appeal, the reviewing court shall remand to the circuit court to allow the party to file a motion pursuant to this rule." Ill. S. Ct. R. 472(e) (eff. May 17, 2019).

¶ 100        In the case *sub judice*, defendant has raised his claim of error in the imposition of sexual assault fines and sex offender fines for the first time on appeal. Thus, in accordance with Rule 472, we decline to reach the merits of the issue and remand to the trial court so that defendant may file a motion pursuant to Rule 472 and raise his claim of error. See *People v. Morocho*, 2019 IL App (1st) 153232, ¶ 52.

¶ 101                         III. CONCLUSION

¶ 102 For the reasons stated, we affirm the trial court's judgment. Regarding defendant's claim of error in the imposition of his fines, we remand the matter so he may file a motion pursuant to Rule 472.

¶ 103 Affirmed and remanded.

| | |
|---|---|
| | **No. 4-16-0818** |
| **Cite as:** | *People v. Hinthorn*, 2019 IL App (4th) 160818 |
| **Decision Under Review:** | Appeal from the Circuit Court of McLean County, No. 14-CF-1469; the Hon. Robert L. Freitag, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Michael Gentithes, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Don Knapp, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Kathy Shepard, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |