2022 IL App (1st) 200721

No. 1-20-0721

Third Division
June 15, 2022

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | No. 18 CR 06683 |
| v. | ) | |
| | ) | The Honorable |
| DEAN KRUEL, | ) | Joseph M. Claps, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1     After a jury trial, defendant Dean Kruel was convicted of one count of aggravated battery and acquitted of two counts of aggravated criminal sexual assault. He was sentenced to three years' imprisonment in the Illinois Department of Corrections (IDOC).

¶ 2     On direct appeal, defendant raises a single issue: whether the trial court violated defendant's constitutional rights to present a defense and confront the witnesses against him by excluding evidence, pursuant to the rape shield statute (725 ILCS 5/115-7(a) (West 2020)),[1]

_____

[1]In *People v. Santos*, 211 Ill. 2d 395, 397 (2004), our supreme court acknowledged that this Illinois statute is commonly referred to as the " 'rape shield' statute," and we adopt this language throughout our opinion.

that other unidentified male DNA profiles were discovered during the forensic testing of the victim's rape kit. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4        The evidence presented at trial established that on March 20, 2018, defendant and the victim, a transgender woman we will call M.S., met through a social networking and dating application. After exchanging messages within the application, they met in person at defendant's apartment, which led to a physical struggle that ultimately resulted in the current charges. Since the issue presented on appeal is narrow, we detail the events of the altercation and ensuing proceedings only insofar as they are relevant for our analysis.

¶ 5                                  I. Pretrial Motions

¶ 6        On April 17, 2019, defendant filed a pretrial motion *in limine* concerning potential rape shield evidence pursuant to section 115-7(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7(a) (West 2020)), which bars evidence of a victim's prior sexual activity in sexual assault cases except under certain limited circumstances. There was no dispute between the parties that the laboratory technician who tested the anal swab from M.S.'s rape kit would testify that she performed the testing of the anal swab and that defendant was excluded as a DNA contributor. However, defendant's motion sought permission to elicit testimony from the laboratory technician that at least two other male DNA profiles *were* found on the swab. Defendant's motion sought to introduce this evidence for two purposes: as substantive proof that defendant did not sexually assault M.S. and to impeach M.S. because, at the time the rape kit was administered, she told medical staff at the hospital she had not had sex within the past 72 hours. The State filed a response, arguing that admitting evidence of unidentified male DNA profiles would violate the rape shield statute.

¶ 7        The trial court heard oral argument and issued an oral ruling on the rape shield evidence motions *in limine* at the following court date.[2] The trial court ruled that whether M.S. had sex within the 72 hours before the rape kit was collateral and therefore inadmissible as impeachment evidence but that evidence that semen belonging to someone other than the defendant was found on M.S.'s body was "going to come into evidence," as it was "favorable to the defense."

¶ 8                                II. Opening Statements

¶ 9        On February 21, 2020, the parties delivered their opening statements. In the State's opening remarks, counsel told the jury:

> "You will also hear, that in that sexual assault kit, it was tested. That there was no DNA. But the DNA analyst will explain to you, that there was no—that there are many reasons why. We don't have evidence that he ever ejaculated, because she bit him in the face and was able to get out of there before he *** had his complete control and power. And she had showered. There was a bowel movement. They will explain many reasons why there's no DNA."

¶ 10        In the defense's opening statement, counsel told the members of the jury that they would hear testimony from the laboratory technician who would inform them, "not like the State says, that there was no DNA. There was DNA. It wasn't [defendant's] DNA. It was another male semen." The State objected. The trial court sustained the objection and instructed the jury to "disregard that."

_____

[2]We note that counsel for the parties were not present when the trial court issued this oral ruling, but representatives from the Office of the Cook County Public Defender and the State's Attorney's Office were present to receive the ruling.

¶ 11        After opening statements, the State requested a sidebar to clarify the trial court's pretrial ruling on the rape shield evidence motions *in limine*. The State argued that, because the trial court granted the State's pretrial motion *in limine*, the defense should not be allowed to cross-examine M.S. regarding other sexual partners or, by extension, the presence of unidentified male DNA profiles. In response, defense counsel maintained that the trial court's pretrial ruling on the motion *in limine* permitted defense counsel to elicit evidence that male DNA profiles were present on the anal swab from the rape kit and that defendant was excluded from that DNA. Neither party had a transcript of the trial court's pretrial ruling available, but the trial court informed the parties that his notes concerning the ruling indicated only that the inconsistent statement that M.S. did not have sex within the last 72 hours was inadmissible, and that ruling would stand. The trial court then asked the defense to explain the relevance of the presence of unidentified male DNA profiles. Defense counsel argued that the evidence was relevant to the defense's theories that M.S. had fabricated the charges against the defendant, that she engaged in intercourse with other individuals to further the fabrication, and that the DNA evidence showed "she's lying about the entire incident." Without hearing further argument, the trial court ruled in the State's favor, finding that testimony that there was any DNA at all discovered during the forensic testing of the rape kit would be "suggestive that it was supplied by somebody else; and that's irrelevant and not material, as covered by the rape shield law."

¶ 12                                III. Evidence at Trial

¶ 13        The State's first trial witness was the victim, M.S., who testified that, when she arrived at defendant's apartment, defendant poured her some wine, which she drank. M.S. was taking medication for gender dysphoria, and she told the defendant that she did not want to drink too

4

much because the medication makes her more susceptible to the effects of alcohol. M.S. and the defendant sat on defendant's couch and talked, at which point M.S. decided she did not want to be intimate with defendant. She told defendant that she was tired and wanted to leave. Defendant poured M.S. more wine and "began to get more physical" with her. Defendant then prepared M.S. some food. M.S. moved from the couch to defendant's bed because she was "very tired." Her memory then became "foggy." M.S. testified that she did not have further memories of her interaction with defendant after she ate, but she thinks she passed out or fell asleep.

¶ 14    M.S. awoke to "a feeling of penetration, very hard and forceful penetration" in her anus. She soon realized that the penetration she felt was from defendant's penis in her anus. She asked the defendant to stop and to get off of her. Defendant did not stop, and M.S. and defendant struggled. As they were struggling, defendant began to "strangle" M.S. and "choke[d]" her, and M.S. "began to gasp for air." M.S. bit defendant, and defendant punched M.S. four times. At some point during the struggle, as M.S. was being strangled, defendant anally penetrated M.S. once more. Ultimately, M.S. was able to "gain control" and fled the apartment unclothed.

¶ 15    M.S. testified that she ran through the hallway and then downstairs to the apartment lobby, making noise and asking for help from other tenants. According to M.S., defendant came out of his apartment holding an aerosol can and a lighter and threatened to set her on fire. In response, M.S. grabbed a fire extinguisher and sprayed the contents throughout the hallway and lobby of the apartment building. Two of defendant's neighbors came out of their apartments and asked if M.S. needed help. Accompanied by these neighbors, M.S. went back upstairs to retrieve her belongings from defendant's apartment. The police arrived, but M.S.

did not want to involve the police at that time, first because she had experienced racial profiling by police in the past and did not want defendant to be racially profiled and second because she was not "fully aware of all the things that [she] had experienced." To explain the disturbance, M.S. told the police there was an issue with her medication.

¶ 16 When M.S. exited the building, she was greeted by a firefighter, who asked if she wanted to be taken to the hospital. M.S. agreed and went to the hospital, where she received stitches for a facial laceration. She did not tell the police, the firefighter, or the hospital staff about what had occurred because she was "thinking about protecting [defendant] from police brutality" and was also "not able to verbalize what happened to [her]."

¶ 17 M.S. further testified that, the day after the incident, she created a "GoFundMe" page seeking to raise funds for her housing, therapy, and food. On the GoFundMe page, M.S. wrote that she had been raped and attacked on the north side of Chicago and had lost her job and housing as a result.

¶ 18 Later, M.S.'s brother and a friend escorted her back to defendant's apartment building to retrieve her car. From outside defendant's apartment building, M.S. reported the incident of the previous night to police. She then went to the hospital for a second time, where police conducted a formal interview with M.S. and hospital staff performed a rape kit.

¶ 19 Next, the State called Angela Kaeshamer, a forensic scientist for the Illinois State Police Forensic Science Center in the biology and DNA section. She testified that she conducted forensic testing of the anal swab from M.S.'s rape kit and determined that defendant's DNA was not found on the swab. Kaeshamer testified that many factors could explain the lack of defendant's DNA even where anal penetration had occurred, including whether the offender

ejaculated, had a vasectomy, or wore a condom; whether the victim bathed or defecated after the penetration; and the length of time of and since the penetration.

¶ 20    Kaeshamer further testified that she learned from the medical documentation provided with the rape kit that M.S. did not have a rape kit performed until 24 hours after the alleged assault, that M.S. had a bowel movement after the alleged assault but before the rape kit was performed, that M.S. showered after the alleged assault but before the rape kit was performed, and that M.S. did not believe the defendant ejaculated during the alleged assault.

¶ 21    In response to the State's direct examination of Kaeshamer, defense counsel requested a sidebar and renewed its motion *in limine* to introduce evidence that other male DNA profiles were identified during Kaeshamer's testing. Defense counsel argued that the State had opened the door to evidence that other male DNA profiles *had* been found in M.S.'s rape kit by eliciting testimony from Kaeshamer that would explain why defendant's DNA *may not* have been found. Defense counsel argued this evidence would show that, if the assault had occurred, there would have been a "great" possibility of defendant leaving behind his DNA. The trial court denied the motion, noting that there was no testimony regarding when the other DNA profiles were deposited and that defense counsel was free to ask Kaeshamer if one additional explanation for the absence of defendant's DNA from the rape kit was that the alleged assault did not happen.

¶ 22    On cross-examination, Kaeshemer testified that, in addition to the anal swab, she also tested fingernail clippings collected from M.S. during the rape kit and did not find defendant's DNA present. Kaeshemer further testified that she was not aware whether defendant had a vasectomy or whether a condom was used and that she did not have any independent conversations with M.S. to verify the assertions in the medical documentation that M.S. had

7

showered and defecated prior to the rape kit being performed. She also testified that one explanation for the absence of defendant's DNA from the anal swab could be that no penetration occurred.

¶ 23    The State's next witness was a jailhouse informant named Rikki Rodriguez. Rodriguez testified that he met defendant while in custody in the Cook County Department of Corrections. According to Rodriguez, defendant admitted to Rodriquez that he was incarcerated for "rape" and proceeded to tell Rodriguez that he had sexually assaulted a transgender person, M.S. Specifically, defendant told Rodriguez that he put the date-rape drug GHB into M.S.'s alcohol before she arrived at his apartment and that eventually M.S. felt the effects of the GHB and "fell out" or "went to sleep" on defendant's bed. Defendant told Rodriguez that he took M.S.'s clothes off and penetrated her anus with his penis. M.S. woke up and started to fight defendant off, but defendant grabbed M.S. by the throat and started punching M.S. in the face. M.S. then bit defendant in the face and ran out of the apartment.

¶ 24    Finally, the State called Dr. Tam Thai, who testified that in the early morning hours of March 21, 2018, M.S. arrived at the hospital where Dr. Thai works and was treated for a facial injury from a claimed assault. Dr. Thai observed that M.S. was in emotional distress and that she had swelling and bruising on the right side of her face near her eye, as well lacerations below her eye and on her right cheek, which were repaired with sutures. Dr. Thai also noticed redness, bruising, and abrasions to M.S.'s neck. However, Dr. Thai did not document those observations in his medical reports that night. Dr. Thai did not order a toxicology screening at that time. The following night, when M.S. returned to the hospital, M.S. reported to Dr. Thai that she had been sexually assaulted the previous evening and consented to the administration of a rape kit, which Dr. Thai performed.

¶ 25    The State called five other witnesses: a neighbor who responded to M.S.'s calls for help in the apartment lobby, M.S.'s mother, and three Chicago Police Department officers. The parties stipulated to the testimony of a fourth Chicago Police Department witness.

¶ 26    During its case-in-chief, the State offered several exhibits into evidence, including a printout of M.S.'s social networking and dating application profile, photos of M.S. taken at the hospital after M.S. reported the incident as a sexual assault that show injuries to M.S.'s face and neck, a printout of M.S.'s GoFundMe page, video surveillance from defendant's apartment building, defendant's arrest photo that shows a bite mark on his cheek, and the photo array. All of the exhibits were entered into evidence.

¶ 27    The defense called one witness: the defendant himself. Defendant testified that, when M.S. arrived at his apartment, he offered her something to drink, and she chose wine. It was defendant's understanding that M.S. was at his apartment for casual sex, and M.S. removed her clothes and entered defendant's bed while defendant finished up some work in his office space. The two talked while defendant worked, and when defendant was done working, he also entered the bed with M.S. They started to kiss and engaged in oral sex, but at a certain point defendant decided he did not want to have intercourse with M.S. Defendant exited the bed and prepared some food, which M.S. consumed. After eating, the two began kissing on the bed again. M.S. indicated to defendant that she "liked aggressive guys" and grabbed defendant around the throat. Defendant pushed M.S.'s hands away, and M.S. motioned toward defendant in what defendant thought was an attempt to kiss him. Instead, M.S. "bit [defendant] on the cheek very hard." Defendant described the bite as a "savage bite" that caused "excruciating pain." Defendant testified that he pushed M.S. off but still felt threatened. Defendant "lost it" and punched M.S. once. Defendant then went to the bathroom to tend to his bite wound. A few

9

minutes later, he noticed that M.S. was gone, but her bag and shoes were still in his apartment. He left the apartment and immediately saw smoke, so he grabbed a retractable baton for protection. When police officers arrived a short time later, defendant told them that M.S. bit him. The following evening, he observed M.S. with two males outside his apartment and called the police. Defendant testified that M.S. indicated through the window that she was also calling the police at that time.

¶ 28    Defendant denied having confessed to the jailhouse informant, Rodriguez, but testified that he had sought advice on his case from Rodriguez and, to that end, had shared the grand jury transcripts from his case with him.

¶ 29                                    IV. Closing Statements

¶ 30    In closing argument, the defense stated in part:

> "The evidence that you have before you is nothing. You had the DNA analyst come and testify before you that there was no DNA found in the anal swab that came back to [defendant]. His DNA was not found in the anal swab. No semen DNA from him, no skin cell DNA from him, no saliva DNA from him. They tested [M.S.'s] fingernail scrapings. He was excluded. No DNA from [defendant] was found in the left fingernail scraping that they received or the right. That is evidence that nothing happened. *** [T]here was no penetration, not even slight, there was nothing."

¶ 31    After deliberating, the jury returned not guilty verdicts as to the aggravated criminal sexual assault charges but found defendant guilty of aggravated battery by way of strangulation.

¶ 32                              V. Posttrial Motion and Sentencing

¶ 33    Defendant's motion for a new trial raised the issue of the trial court's exclusion of the unidentified male DNA evidence for the third time. Defendant renewed its argument that the

10

State had opened the door to evidence that there were other male DNA profiles found on the anal swab by eliciting possible explanations for why defendant's DNA was not found on the swab and that the trial court's exclusion of this evidence violated defendant's due process rights. The trial court denied the motion.

¶ 34   The trial court sentenced defendant to three years of imprisonment in IDOC followed by one year of mandatory supervised release. This appeal timely followed.

¶ 35                                                    ANALYSIS

¶ 36   On this direct appeal, defendant claims that the trial court erred by refusing to admit evidence that other unidentified male DNA profiles were discovered in the forensic testing of M.S.'s rape kit because the evidence was relevant and that the State opened the door to such evidence. The State contends that the trial court properly excluded the evidence because it was irrelevant and barred by the rape shield statute. We do not find defendant's arguments persuasive and thus affirm his conviction.

¶ 37   We review a trial court's evidentiary rulings for abuse of discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010); *People v. Johnson*, 2014 IL App (2d) 121004, ¶ 42 ("[e]videntiary rulings made pursuant to the rape-shield statute are reviewed for an abuse of discretion"). A trial court abuses its discretion only when its ruling is "arbitrary, fanciful or unreasonable" or "where no reasonable man would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Santos*, 211 Ill. 2d 395, 401 (2004). Because there is no dispute that defendant preserved the rape shield evidence issue for our review by raising it both in a motion *in limine* and in a posttrial motion (see *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007)), if we conclude the trial court abused its discretion in excluding the evidence, then the burden shifts to the State to show that the error was harmless beyond a reasonable doubt. *People v.*

11

*Johnson*, 238 Ill. 2d 478, 488 (2010). We first determine whether the trial court committed error. *Piatkowski*, 225 Ill. 2d at 565 ("the first step is to determine whether error occurred").

¶ 38     We thus turn to the statute. The rape shield statute bars, in sex offense prosecutions, the admission of evidence of "the prior sexual activity or the reputation of the alleged victim." 725 ILCS 5/115-7(a) (West 2020); *Santos*, 211 Ill. 2d at 401-02. The statute provides only two exceptions to this otherwise "absolute[ ]" bar. *Santos*, 211 Ill. 2d at 401-02. Evidence of a victim's prior sexual history may be admissible (1) when consent is an issue and defendant seeks to introduce prior sexual activity between himself and the victim or (2) when the evidence is constitutionally required to be admitted. 725 ILCS 5/115-7(a) (West 2020); *Santos*, 211 Ill. 2d at 402.

¶ 39     In the case at bar, defendant does not claim the first exception applies. Consent was not an issue because defendant maintains that the assault never occurred. Instead, he seeks admission of the unidentified male DNA evidence under the second exception. He argues that his sixth amendment rights to present a defense and confront the witnesses against him required admission of this evidence because the presence of unidentified male DNA profiles would have corrected the false impression—created by the State—that no DNA at all was found during the forensic testing of M.S.'s rape kit. This error, defendant argues, denied defendant the ability to adequately present his theory of the case or "provide the jury with a full, accurate picture of the DNA evidence."

¶ 40     The sixth amendment to the United States Constitution provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him *** and to have the Assistance of Counsel for his defence." U.S. Const., amend. VI. Similarly, our state constitution provides that, "[i]n criminal prosecutions, the

12

accused shall have the right to appear and defend" and "to be confronted with the witnesses against him." Ill. Const. 1970, art. I, § 8. As defendant correctly argues, these rights would be hollow if the State were permitted to exclude competent, reliable evidence that is "central to the defendant's claim of innocence." See *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Accordingly, our courts have acknowledged that evidence of a victim's prior sexual history is admissible where that evidence is relevant to show the victim's bias, prejudice, or motive (*People v. Sandoval*, 135 Ill. 2d 159, 185 (1990)); to negate the establishment of an element of the crime charged (*Sandoval*, 135 Ill. 2d at 188); or when that history explains some physical evidence, such as semen, pregnancy, or physical indications of intercourse. See *People v. Starks*, 365 Ill. App. 3d 592, 600 (2006). Said differently, the constitutional exception "requires that a defendant be permitted to offer certain evidence which [is] *directly* relevant to matters at issue in the case, notwithstanding that it concern[s] the victim's prior sexual activity." (Emphasis in original and internal quotation marks omitted.) *Johnson*, 2014 IL App (2d) 121004, ¶ 42.

¶ 41     In the case at bar, we are not persuaded that the excluded evidence was directly relevant to a material issue in the case, let alone so "central" as to overcome the protections of the rape shield statute. This is not a case of mistaken identity, nor is evidence of unidentified male DNA relevant to show M.S.'s bias, prejudice, or motive. In addition, because there was no evidence of semen, pregnancy, or physical indications of intercourse presented at trial, there was no need to introduce any further evidence to explain it. Defendant's theory of the case was that the events of March 20-21, 2018, did not transpire as M.S. alleged: that although defendant and M.S. were involved in a physical altercation, defendant did not penetrate or strangle M.S. Where, as here, defendant's theory is that he *did not* penetrate M.S., evidence that somebody

13

else *did* penetrate M.S. does not directly support the theory.[3] See *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 76 (assuming the two unidentified male DNA profiles present on victim's swab were from consensual partners, such evidence would have no bearing on whether victim consented to sexual relations with the defendant); *People v. Bates*, 2018 IL App (4th) 160255, ¶ 65 ("[T]his is not a case where a defendant contends that he had consensual sex with a victim but argues that another unknown individual subsequently raped the victim. Instead, defendant's theory was that he had never had sex with [the victim].").

¶ 42    Defendant nevertheless maintains that the barred evidence was relevant because, if deposited before the alleged assault, the presence of unidentified male DNA would tend to negate the inference that defendant's DNA was present at one point but washed away by the passage of time, showering, or defecation. However, it is undisputed that 24 hours elapsed before the rape kit was performed, and whether M.S. showered or defecated after the alleged assault can only be described as, at best, "marginally relevant." *Bates*, 2018 IL App (4th) 160255, ¶¶ 59, 64 ("The constitution does not require the admission of evidence which is only marginally relevant ***."). The relevance of the unidentified male DNA evidence is especially limited here, where the jury heard several alternatives that could also explain the absence of defendant's DNA, including that the encounter was too brief to deposit DNA; that the defendant may have worn a condom, failed to ejaculate, or had a vasectomy; or that no

_____

[3]To the extent defendant's theory of the case also incorporates the theory that M.S. fabricated her sexual assault allegations against him, we remain unconvinced that the presence of other male DNA profiles could bolster that theory. It strains credulity to suggest that M.S. would initiate sexual intercourse that did not cause injury *with other individuals* in order to frame *defendant* for sexual assault. *Cf. People v. Jones*, 264 Ill. App. 3d 556, 566 (1993) ("[N]othing logically links the victim's prior instance of sexual conduct with the alleged motive to lie. [Defendant's] argument, when stripped bare, advances the theory that a defendant may circumvent the rape shield statute and explore the victim's prior sexual history whenever he asserts that the victim has any motive to lie, which is, of course, absurd.").

14

penetration occurred. Thus, the evidence of unidentified male DNA on the anal swab "would not have excluded the [d]efendant from sexually assaulting [the victim] in this case." (Internal quotation marks omitted.). Finally, the relevance of unidentified male DNA to the question of whether defendant strangled M.S.—the only count for which defendant was convicted—is even more remote. See *People v. Sandifer*, 2016 IL App (1st) 133397, ¶¶ 29, 65 (a court may reject as irrelevant evidence that is remote, uncertain, or conjectural). Where, as here, evidence of a victim's sexual history would not make a "meaningful contribution to the fact-finding enterprise," the evidence "is not constitutionally required to be admitted." (Internal quotation marks omitted.) *Johnson*, 2020 IL App (1st) 162332, ¶ 73. In addition, the jury found the defendant not guilty of the sexual assault charges.

¶ 43    Defendant next argues the federal constitution required that the trial court admit evidence of unidentified male DNA profiles under the doctrine of "curative admissibility." The doctrine of curative admissibility provides that "[i]f A opens up an issue and B will be prejudiced unless B can introduce contradictory or explanatory evidence, then B will be permitted to introduce such evidence, even though it might otherwise be improper." *People v. Manning*, 182 Ill. 2d 193, 216 (1998). Defendant argues that the State "opened the door" to evidence that other male DNA profiles were present on the anal swab in two ways: first by offering in its opening statement that "there was no DNA" and second by eliciting explanations from the laboratory technician as to why defendant's DNA may not have been found on the anal swab. Defendant maintains that, taken together, these statements created the "false impression" that no DNA was found on the anal swab at all.

¶ 44    While determining whether to admit otherwise inadmissible evidence under the curative admissibility doctrine, the central question is one of prejudice. See *Manning*, 182 Ill. 2d at 216-

15

17 ("[T]he doctrine of curative admissibility *** is limited in scope and design to those situations where its invocation is deemed necessary to eradicate *undue* prejudicial inferences which might otherwise ensue from the introduction of the original evidence." (Emphasis in original and internal quotation marks omitted.)); *People v. Mandarino*, 2013 IL App (1st) 111772, ¶ 29 ("The doctrine is protective, and only shields a party from unduly prejudicial inferences raised by the other side."); *People v. Hinthorn*, 2019 IL App (4th) 160818, ¶ 71 ("The doctrine allows a party under limited circumstances to 'present inadmissible evidence when necessary to cure undue prejudice resulting from an opponent's introduction of similar evidence.' ").

¶ 45        In the case at bar, although we have no doubt that the jury was left with the impression that there was no DNA at all found during the forensic testing of M.S.'s rape kit, we are not persuaded that this impression was in any way prejudicial to defendant. To the contrary, a total lack of DNA evidence bolsters defendant's claim that he did not anally penetrate or otherwise sexually assault M.S. The closest defendant comes to articulating prejudice is to suggest that the evidence of additional DNA profiles could have called into question the "believability of the State's theory" that M.S.'s behavior after the assault (*i.e.*, waiting 24 hours to consent to a rape kit, showering, or defecating) removed DNA evidence that was once present. However, as discussed above, the State's theory of why defendant's DNA was absent from the anal swab was not limited to those behavioral explanations, and more importantly, the jury's not guilty verdict as to the sexual assault charges reveals that the jury did not believe the State's theory that defendant's DNA was ever present. Thus, while we agree with defendant that the State's affirmative misstatement of the evidence in its opening remarks, "there was no DNA," was error, that error was harmless. Because neither the State's opening statement nor the testimony

16

of the laboratory technician created a *prejudicial* false impression, the trial court did not abuse its discretion in declining to admit supposedly "curative" rape shield evidence in response.[4]

¶ 46　　Our holding in the case at bar is consistent with the curative admissibility authority cited by defendant. In *People v. Payne*, 98 Ill. 2d 45 (1983), our supreme court affirmed the trial court's decision to admit previously suppressed weapons found in defendant's vehicle, where the defense had falsely implied that the police's search of the vehicle had uncovered no evidence connected to the robbery for which defendant was on trial. *Payne*, 98 Ill. 2d at 48-50. There, the jury was left with an impression that was not only false, but also unfairly tipped the balance of the evidence against the State. Unlike the case at bar, the "clear and unmistakable impression" left by the defense's conduct in *Payne* was prejudicial and in need of correction. *Payne*, 98 Ill. 2d at 50. Similarly, in *Hinthorn*, defendant successfully fought to exclude certain evidence pretrial but then later attempted to rely on the absence of that evidence to impugn the credibility of a key witness. *Hinthorn*, 2019 IL App (4th) 160818, ¶ 72. The State was thus permitted to introduce the previously excluded evidence in order to correct the prejudicial misimpression defendant created. *Hinthorn*, 2019 IL App (4th) 160818, ¶¶ 74-75. Neither the *Payne* court nor *Hinthorn* court confronted the situation presented here, where the "false impression" created by the exclusion of the evidence was favorable to the opposing side,

---

[4]We note that, even if we were to find the curative admissibility doctrine permitted entry of the otherwise inadmissible evidence of unidentified male DNA profiles, that would not end the inquiry. The Seventh Circuit has cautioned, while applying Illinois's rape shield statute, that a "prosecutor is not authorized to waive the protections of the rape shield law—for they are protections as much for the rape victim as for the prosecution of rape cases—and if he does so this does not open the door to defense counsel to disregard the rape shield law." *Sandoval v. Acevedo*, 996 F.2d 145, 148 (7th Cir. 1993). Indeed, prior to admitting even relevant rape shield evidence, a trial court is required to weigh the probative value of the evidence against the "danger of humiliating the alleged victim by calling into question his or her chastity." *People v. Maxwell*, 2011 IL App (4th) 100434, ¶ 87; 725 ILCS 5/115-7(b) (West 2020). Here, given the scant probative value of the evidence relative to the potential for harm to M.S., there was no abuse of discretion in refusing to admit it.

sufficiently favorable, in fact, for the defense to reinforce it during closing statements: "The evidence before you is nothing."

¶ 47    Defendant maintains that the split verdict demonstrates the jury had "serious doubts" about M.S.'s version of events and that evidence of unidentified male DNA profiles, if admitted, would have cast further doubt on her credibility, possibly resulting in an acquittal on all charges. We are not persuaded by defendant's argument. First, we disagree that the split verdict reveals the jury deliberations boiled down to a credibility contest. To the contrary, it appears that the jury's verdict turned on the physical evidence: a lack of DNA or anal injuries to support the sexual assault counts, compared with the presence of bruising and redness on M.S.'s neck, as depicted in the photos taken at the hospital by police, to support the aggravated battery by way of strangulation count. Second, evidence of the unidentified male DNA profiles could only weaken M.S.'s credibility to the extent she could be impeached with that evidence. Yet our supreme court has held that "precluding a defendant in a sexual assault trial from impeaching a complaining witness on a collateral matter does not contravene the constitution." *Santos*, 211 Ill. 2d at 407 (citing *Sandoval*, 135 Ill. 2d. at 181). Here, as in *Santos*, the allegedly untrue statement that M.S. did not have sex with others during the 72 hours prior to her rape kit is "collateral to the controverted issues in the case," namely, whether defendant sexually assaulted and strangled M.S. on the night in question. See *Santos*, 211 Ill. 2d at 407-08; see also *People v. Hill*, 289 Ill. App. 3d 859, 863 (1997) ("The [rape shield statute] ends collateral use of past sexual conduct as a basis for weighing an assault victim's credibility."). That M.S.'s allegedly untrue statement was made to hospital staff instead of before the jury diminishes the impeachment value of the unidentified male DNA evidence even further. See *Santos*, 211 Ill. 2d at 408.

18

¶ 48    Accordingly, we find no abuse of discretion in the trial court's exclusion of evidence that unidentified male DNA profiles were found on the anal swab collected from M.S.'s rape kit. Because we find no error in that regard, we need not consider whether any error was harmless beyond a reasonable doubt. *People v. Vargas*, 409 Ill. App. 3d 790, 796 (2011).

¶ 49                                CONCLUSION

¶ 50    For the reasons stated, we affirm the defendant's conviction.

¶ 51    Affirmed.

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-06683; the Hon. Joseph M. Claps, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Carrie Darden, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Matthew Connors, and Leslie Billings, Assistant State's Attorneys, of counsel), for the People. |