NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240569-U

NO. 4-24-0569

IN THE APPELLATE COURT

FILED
August 12, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| CHRISTOPHER HINTHORN, | ) | No. 14CF1469 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Harris and Justice Steigmann concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed the denial of defendant's postconviction petition, holding (1) defendant did not demonstrate trial counsel provided ineffective assistance and (2) defendant did not rebut the presumption postconviction counsel provided reasonable assistance.

¶ 2     Defendant, Christopher Hinthorn, appeals from the third-stage denial of his petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2024)). Defendant asserts (1) the trial court erred when it found he had failed to show trial counsel was ineffective when he opened the door to the admission of prejudicial evidence and (2) postconviction counsel failed to comply with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) and failed to provide reasonable assistance when he excluded nonfrivolous claims set out in defendant's *pro se* petition from the amended petition. We affirm.

¶ 3                                      I. BACKGROUND

¶ 4 The appellate court set forth the underlying facts of this case in defendant's prior appeal. *People v. Hinthorn*, 2019 IL App (4th) 160818. Accordingly, we recite only those facts necessary to resolve the issues presented on appeal.

¶ 5 A. Pretrial Proceedings

¶ 6 In December 2014, a grand jury indicted defendant on eight counts involving sex offenses against his daughter, R.H., a minor. The indictment contained four counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(1) (West 2004)) and four counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2004)). One count of each offense was based on the theory defendant was accountable for the conduct of his wife, H.H. The specifics of the indictment appear in *Hinthorn*, 2019 IL App (4th) 160818, ¶¶ 4-7. The acts giving rise to the charges allegedly occurred no earlier than April 2005 and no later than April 2011.

¶ 7 Defendant moved unsuccessfully for substitution of the judge based on his involvement as a prosecutor in a case involving defendant and H.H. in 1997.

¶ 8 The State filed a motion pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2014)) to admit testimony of other-crimes evidence relating to defendant's sexual assaults on H.H. Defendant filed a motion *in limine*, asking the trial court to prohibit the State from introducing at trial any evidence of unlawful or immoral acts perpetrated against H.H. by defendant during the course of their marriage or at any other time.

¶ 9 The trial court granted defendant's motion *in limine*. The State, conceding the court's ruling on defendant's motion resolved all issues, withdrew its motion pursuant to section 115-7.3. The court found the evidence of defendant's assaults on H.H. were "of some probative value," but it concluded the "prejudicial effect [was] overwhelming." When the State moved to reconsider the ruling, the court noted it could readdress during the trial whether the evidence at

issue was admissible as other-crimes evidence, as opposed to evidence under section 115-7.3. The court also clarified its ruling did not bar evidence of nonsexual misconduct by defendant.

¶ 10                                    B. Jury Trial

¶ 11          Defendant's jury trial started in June 2016. Defendant was represented by Steven Skelton and a second lawyer. Skeleton, in his opening argument, told the jury the evidence would show R.H.'s family had been destroyed "at least in part if not in large part [due] to the consumption of alcohol by [defendant]." R.H. in particular "despised his drinking" and thus hated the visitation forced on her by H.H.'s divorce from defendant. R.H. often lied to avoid visitation. Shortly before she made the disclosure to her youth pastor which led to police involvement, H.H. had made an unsuccessful attempt to get an order of protection against defendant; she wanted to end the children's visitation with him. The failure distressed R.H. and prompted her "outburst[ ]" to the pastor.

¶ 12          Skelton asserted to the jury H.H.'s testimony would also be implausible on a critical point. Although the evidence would show R.H. had previously disclosed sexual abuse by defendant to H.H., H.H. never acted on this information. Moreover, when the youth pastor told H.H. about R.H.'s disclosure, H.H. did nothing.

¶ 13                                    1. *The State's Case*

¶ 14          The cumulative testimony of the State's witnesses revealed, in the last week of November 2014, the Bloomington, Illinois, police received information from the Illinois Department of Children and Family Services relating to an allegation defendant had sexually abused R.H. The information originally came from R.H.'s youth pastor, Candi Evans, a witness who testified both for the State and defendant.

¶ 15          As a result of Evans's call, Detective John Heinlen of the Bloomington Police

Department was assigned to investigate. He went to R.H.'s home and arranged for R.H. to go to an interview at the McLean County Children's Advocacy Center (CAC) on December 2, 2014. Heinlen observed this interview. He also spoke with H.H., who had accompanied R.H. to the CAC. During this conversation, he became concerned H.H. previously had sexual contact with R.H. He therefore interviewed H.H. as a potential suspect. During the interview, H.H. made relevant admissions.

¶ 16　　　　Heinlen then conducted an interview with defendant lasting five or six hours. Defendant admitted to having sex with H.H. in R.H.'s bedroom, but he denied any sexual contact with R.H. Defendant told Heinlen he and R.H. had an argument, during which she accused him of raping her. Heinlen, like Evans, testified for both parties.

¶ 17　　　　　　　　　　　　　　　a. R.H.

¶ 18　　　　R.H. testified early in the State's case. She was 16 years old at the time of trial. When she was "[a]round five," defendant did something to her which made her uncomfortable. She did not describe what happened in sexual terms, but her description was consistent with defendant having sexual contact with her. She said something similar happened "[m]ore than two," "probably just around three or four" times after the first incident. She was "[s]even or eight" the last time something happened. She did not think anyone else had been present during any of these incidents.

¶ 19　　　　R.H., her mother, and her younger brother, D.H., moved out of the house they shared with defendant when R.H. was nine. When R.H. was 12 or 13, she told J.H. (her aunt) and P.H. (her cousin) her father had sexually abused her, but she never gave them any details about what had happened. She also told four others—(1) Evans, (2) H.H., (3) her boyfriend, and (4) the interviewer at the CAC—about the abuse. R.H. said her trial testimony was more detailed than

- 4 -

what she had told the CAC interviewer.

¶ 20     Defense counsel cross-examined R.H. at length. Counsel focused on R.H.'s dislike of defendant and her distaste for spending time with him. R.H. agreed, in November 2014, after H.H.'s petition for an order of protection was denied, H.H. had told her she might be jailed if R.H. missed visitation with defendant.

¶ 21     Counsel asked R.H. whether she lied to avoid visiting defendant. She denied lying: she said all the excuses she had given were true. He inquired about differences between what R.H. said during direct examination and both what she told Evans and what she said to the CAC interviewer. He challenged the plausibility of the incidents she had described going unnoticed.

¶ 22                              b. P.H. and J.H.

¶ 23     P.H. and J.H. both testified about a disclosure of sexual abuse by defendant R.H. made to them. P.H., who was a year older than R.H., was R.H.'s friend and cousin; J.H. was P.H.'s mother and was married to defendant's brother. P.H. testified, one day, when P.H. was "[b]etween the ages of eight and twelve," P.H. spontaneously asked R.H. "if her dad had touched her sexually in any sort of way." R.H. eventually said he had. P.H. later told J.H., and the two drove to R.H.'s house to find her. They found R.H. outside and got her into their car to talk about the disclosure. R.H. cried, but she eventually repeated her admission defendant had touched her.

¶ 24     J.H. said R.H. was seven or eight years old when the disclosure took place, but the disclosure definitely occurred when R.H. was no longer living with defendant. After the conversation with R.H., J.H. called H.H. to tell her about R.H.'s disclosure.

¶ 25     Defense counsel cross-examined P.H. and J.H. concerning the timing of the conversations with R.H. and whether R.H. was unhappy visiting defendant.

¶ 26                              c. The Expert Witnesses

¶ 27        Two expert witnesses testified about the characteristics of evidence in child sexual abuse cases. Helen Appleton testified victims of child sexual abuse often delayed disclosing the abuse. Defense counsel cross-examined her about fabricated disclosures, particularly when the child was part of a custody dispute. Maureen Hofmann testified it was rare to find physical evidence of sexual abuse when disclosure is delayed. Defense counsel questioned her about, *inter alia*, how much pain a girl of about five would experience from different kinds of genital contact.

¶ 28                                    d. H.H.

¶ 29        H.H. testified she and defendant were married in 1995. R.H. was born in April 2000; D.H. was born in 2003. After R.H. was born, defendant "started accusing [H.H.] of having sex with her." These statements were originally rare, but they "got to be very frequent[ ]," anywhere from two to four times a week. Defendant's statements were not accusations; instead, defendant was angry H.H. would not let him participate. Later, when R.H. was about six or seven, he said "he wanted to have sex with her."

¶ 30        H.H. described an incident with defendant which took place during "the middle of the night" when R.H. was approximately five years old. Defendant demanded to have sex with H.H. while she performed oral sex on R.H. H.H. attempted to comply but said she wanted to throw up. Her testimony indicated a brief sexual contact with R.H. When asked why she complied with defendant's demands on the night at issue, she said she was "afraid of getting beaten again."

¶ 31        H.H. said defendant's threats kept her from leaving him after this incident. Because defendant claimed to have proof H.H. was molesting R.H., H.H. was afraid if she left defendant, he would receive full custody of R.H. and D.H. For the same reason, when H.H. filed for divorce from defendant, she never told anyone about the incident in which she had sexual contact with

R.H.

¶ 32    H.H. said R.H. was 11 or 12 years old when R.H. first disclosed being sexually abused by defendant; she thought it was "before April of 2012." H.H. went to get R.H. from a friend's house, and the friend's mother said, " '[R.H.] told me that her dad raped her.' " H.H. did not take this information to the police because R.H. said she was unwilling to talk about the abuse. She was afraid if she, rather than R.H., spoke to the police, it would work against her in in postdissolution proceedings.

¶ 33    Nevertheless, after this disclosure, H.H. filed a petition for an order of protection against defendant; she asked, *inter alia*, for her children's visits with defendant to cease. This petition did not include R.H.'s disclosure because H.H. did not want to "make things worse" for R.H. Up until the petition's filing, R.H.'s visitation with defendant had followed a stable pattern. Defendant did not always exercise his visitation rights, and if R.H. said she did not feel well and did not want to visit defendant, defendant would acquiesce. After failing to get the visitations ended, H.H. told R.H. if R.H. did not visit defendant, H.H. could go to jail for failing to abide by a court order. Upon hearing this, R.H. "had a meltdown."

¶ 34    On cross-examination, Skelton asked H.H. whether it was correct she remained silent about R.H.'s disclosures for "a great number of years." H.H. agreed. Moreover, she never brought R.H.'s disclosures to the attention of any authority. H.H. also conceded she had encouraged R.H. to offer reasons for skipping visitation, which H.H. did not think were truthful. She denied telling R.H. defendant was "mean" but conceded she spoke about defendant's heavy drinking, which she said was obvious.

¶ 35    Then Skelton asked H.H. whether she had spoken untruthfully when interviewed at the CAC when she told them she "didn't know anything about sexual abuse during the divorce."

H.H. responded she had admitted to the incident in which she participated.

¶ 36            The following exchange ensued:

"[DEFENSE COUNSEL]: Well, did you tell them *** during that initial interview at the [CAC] that [defendant] tried to force you to have sex with [R.H.] but you said no?

A. Yes.

Q. Did you tell them that, 'I would rather take a beating with a leather belt than have sex with my daughter'?

A. That did happen and, yes, I told them that.

Q. Do you remember being asked if he ever tried to force you to engage in sexual activity with your daughter and answered, 'He tried multiple times'?

A. Yes.

Q. And did you insist to the two interviewers that you were trying to protect your daughter?

A. Yes."

Skelton also challenged her concerning other inconsistencies in her statements.

¶ 37            At the end of H.H.'s cross-examination, the State asked the trial court to find Skelton's questions had opened the door to questions barred by the motion *in limine*. It argued, when Skelton asked H.H. questions about why she feared defendant, the restrictions placed on her testimony had resulted in the jury receiving a misleading impression of H.H.'s psychological state; H.H. had been forced to give only "half of the story." The State argued the misimpression could be cured if it could ask H.H. a few questions about defendant raping her. It also said it was contemplating recalling Detective Heinlen to testify to defendant's admission he raped H.H.

¶ 38 In response, the second defense attorney argued the issue "was fully litigated" when the motions were heard and "we believe that the judge's ruling is now law of the case."

¶ 39 The trial court ruled the evidence was admissible for the limited purpose of explaining H.H.'s state of mind.

¶ 40 After the trial court instructed the jury to consider the evidence which would follow only to explain H.H.'s state of mind, the State asked H.H. whether defendant used something more than beatings to force her to have sexual contact with R.H. She responded defendant had forcibly raped her more than once before he coerced her into contact with R.H. She agreed defendant would rape her when she did not do what he told her.

¶ 41 The State then sought leave to recall Detective Heinlen to testify defendant had admitted he raped H.H. Defense counsel objected, asserting the evidence was not relevant to H.H.'s state of mind. The trial court allowed the questioning, and, after the court told the jury it should consider Heinlen's testimony only as evidence of H.H.'s state of mind, Heinlen testified defendant had raped H.H. "multiple times." The State then rested.

¶ 42 Defense counsel moved for a directed verdict, arguing, among other things, R.H. had specifically described only one incident of possible sexual abuse occurring when she estimated she was five years old; the other charges not involving H.H. rested on R.H.'s testimony defendant, on dates R.H. could not estimate, had done things similar to what she described "[p]robably just around three or four" times. The trial court denied the motion as to all counts, but it stated the matter was extremely close as to the charges resting on R.H.'s testimony defendant had committed several acts similar to the one which occurred when she was approximately five years old.

¶ 43                              2. *Defendant's Case*

¶ 44 The defense called Evans and Detective Heinlen. Evans agreed R.H. had said

defendant's sexual contact with her had occurred within the past year. The defense questions to Heinlen tended to show discrepancies between H.H.'s testimony and her statements to Heinlen.

¶ 45    After defendant confirmed his decision not to testify, the defense admitted H.H.'s petition for dissolution of marriage and the dissolution decree as defense exhibits, and it rested its case.

¶ 46                          3. *Closing Statements*

¶ 47    In closing, the State made use of the evidence H.H. was raped to argue the jury could make some sense of what was going on in her mind.

¶ 48    In the closing argument for the defense, Skelton argued, "Given the d[y]sfunctionality of the family that we're talking about, I would suggest that it's reasonable to infer that [H.H.] made a number of comments over the years about [defendant], about her feelings about him, and tried and probably succeeded in poisoning [R.H.'s] mind against [defendant]." He suggested one of the triggering events for R.H.'s final disclosure was H.H.'s warning to R.H. she could be jailed if R.H. missed visitation with defendant. He generally attacked the credibility of R.H. and H.H.

¶ 49    Skelton asked the jury to consider R.H.'s manner of testifying—looking down, speaking in a near whisper, not using standard terms for body parts, and so on—tended to show "she's got enough of a conscience that she feels bad somewhere in her core about saying things that are not accurate, that are not true, and that have been made up over the years to accomplish her goal of getting away from her father."

¶ 50    Finaly, Skelton argued H.H.'s testimony was not credible. He suggested if what H.H. said about her actions were true, she would have been charged with abuse. He pointed out her repeated denials and shifting details of what occurred. He argued the apparent irrationality of

H.H. taking a night shift job, given what she said defendant had done. Counsel asked why H.H. never protected her daughter by calling 911 or taking her to a doctor.

¶ 51    The jury found defendant guilty of the charges based on the allegations regarding contact between him and R.H. but not guilty on the counts based on defendant's accountability for H.H.'s actions with R.H.

¶ 52                    C. Defendant's Direct Appeal

¶ 53    On appeal, defendant raised two issues relevant to this case: (1) the judge improperly admitted evidence relating to defendant's conduct against H.H. and (2) the State failed to prove him guilty beyond a reasonable doubt.

¶ 54    First, concerning the admission of the offenses against H.H., we held the cross-examination of H.H. was:

> "the exact situation for which curative admissibility was created. Defense counsel sought to use the pretrial ruling to preclude the State from fully disclosing the bases for H.H.'s fear of defendant and then infer she should not be believed since she had already indicated to investigators the possibility of a beating alone would not have been enough to cause her to perform the act. Discrediting H.H. was crucial to defendant's case since his defense was based, in large part, on the claim H.H. was the source of the fabricated allegations by R.H. and was the motivating force behind his prosecution." *Hinthorn*, 2019 IL App (4th) 160818, ¶ 72.

Therefore, "the State was permitted to point out how H.H.'s fears were grounded not only on beatings, but also rapes, by defendant." *Hinthorn*, 2019 IL App (4th) 160818, ¶ 75.

¶ 55    Second, concerning the sufficiency of the evidence, defendant argued R.H.'s testimony about his sexual contact with her was so vague it might, at most, support one conviction

of predatory criminal sexual assault. *Hinthorn*, 2019 IL App (4th) 160818, ¶ 91. We concluded, taking the evidence "in the light most favorable to the State," the jury could have reasonably concluded defendant was guilty of all three counts of predatory criminal sexual assault. *Hinthorn*, 2019 IL App (4th) 160818, ¶ 96.

¶ 56        D. Defendant's *Pro Se* Postconviction Petition

¶ 57   In 2020, defendant filed a *pro se* petition for relief under the Act. He first asserted he had received ineffective assistance of trial counsel. He described nine allegedly unreasonable acts or omissions by counsel, of which seven are relevant to this appeal. The first allegation is based on defense counsel's cross-examination of H.H. and the resulting admission of evidence relating to his rapes of H.H. The third and fourth allegations relate to counsel's failure to raise discrepancies in witnesses' testimony or attack their credibility. The fifth and sixth allegations relate to counsel's failure to call impeachment witnesses. The eighth allegation relates to counsel's failure to seek to have the trial judge disqualified based on his involvement in a prior case of defendant's. Defendant also argued appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness.

¶ 58   Defendant's petition was automatically docketed for second-stage proceedings when the trial court did not address it within 90 days. See 725 ILCS 5/122-2.1(b) (West 2020). Counsel was appointed to represent defendant.

¶ 59        E. The Amended Petitions

¶ 60   Postconviction counsel filed both an amended postconviction petition and a second amended petition. The second amended petition raised three claims: (1) trial counsel provided ineffective assistance when his questioning of H.H. opened the door to the State's introduction of evidence defendant raped H.H., (2) trial counsel was ineffective for failing to argue due process

considerations required the trial judge to recuse himself, and (3) appellate counsel was ineffective for failing to raise those issues on direct appeal. Counsel's second amended petition was accompanied by a certificate of compliance with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017).

¶ 61 The State filed a response to the second amended petition, which addressed the merits of the claims and did not suggest a procedural forfeiture. The trial court set a third-stage evidentiary hearing on all claims.

¶ 62 F. The Evidentiary Hearing and the Trial Court's Ruling

¶ 63 At the evidentiary hearing, defendant relied on exhibits taken from the record. The State called trial counsel Skelton as its sole witness. Skelton testified he remembered H.H.'s testimony "vividly." He agreed he wanted to make the jury perceive her as lacking credibility; he testified his approach was to focus on the inconsistencies in H.H.'s statements. Asked how the trial court's order limiting the evidence concerning defendant's rapes of H.H. guided his cross-examination, he responded:

> "When you have evidence that you've asked the Court to preemptively limit, you're aware, and I was aware, that if I were to overstep my bounds, so to speak, that that could end up in doing what we refer to as opening the door to allow that testimony in. So from a strategic standpoint, you want to get as close to that line as you possibly can without going over it. And then it's a tricky process at times."

Skelton did not recall how the court's ruling had opened the door to the excluded evidence but said he assumed he made "valid counter-arguments to the judge's position and the State's position at that point in time." Asked by defendant whether he believed he had made a mistake in his

cross-examination of H.H., he responded, "I didn't [think so] on that date, and looking back, I don't think I did. I disagreed with the Court's ruling, but the Court's ruling is the Court's ruling."

¶ 64      The trial court denied the petition. It found "defense counsel's strategic decisions made in the heat of trial of this case to be within the range of reasonable professional assistance. Even though the questioning was ultimately found to have opened the door to previously barred testimony, it did not fall below an objective standard of reasonableness." It further ruled, because the jury found defendant not guilty of the counts based on accountability, defendant could not show prejudice.

¶ 65      This appeal followed.

¶ 66                              II. ANALYSIS

¶ 67      On appeal, defendant argues (1) the trial court erred in denying his postconviction petition where he demonstrated trial counsel was ineffective for opening the door to "overwhelmingly prejudicial evidence" and (2) postconviction counsel provided unreasonable assistance and violated Rule 651(c) by "eliminating meritorious claims" of ineffective assistance of counsel. Defendant asserts, among other things, his petition alleged and documented multiple instances in which counsel could have impeached witnesses, particularly H.H. and R.H.

¶ 68                        A. The Standard Under the Act

¶ 69      The Act creates a three a three-stage process for a defendant to advance a claim based on " 'a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both.' " *People v. Addison*, 2023 IL 127119, ¶ 18 (quoting 725 ILCS 5/122-1(a)(1) (West 2016)). At the first stage, the test for a claim of ineffective assistant of counsel "is whether it is arguable that counsel's performance fell below an objective standard of reasonableness and whether it is arguable that the defendant was prejudiced." *People v. Tate*, 2012

- 14 -

IL 112214, ¶ 22.

¶ 70 "At the second stage of proceedings, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true" (*People v. Pendleton*, 223 Ill. 2d 458, 473 (2006)); in other words, the Act reserves resolution of most questions of fact for the third-stage evidentiary hearing. "Throughout the second and third stages of a postconviction proceeding, the defendant bears the burden of making a substantial showing of a constitutional violation." *Pendleton*, 223 Ill. 2d at 473.

¶ 71 A petition advances to the third stage and receives an evidentiary hearing if the petition's allegations, as supported by the record and other evidence, "make a substantial showing of a deprivation of constitutional rights." *People v. Huff*, 2024 IL 128492, ¶ 19.

¶ 72 The parties agree, when a trial court denies a petition alleging ineffective assistance after a third-stage evidentiary hearing, review is bifurcated. A trial court's "factual findings and credibility determinations made at a third-stage evidentiary hearing of a postconviction proceeding should be disturbed only if manifestly erroneous, that is, only if the court committed an error that is clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Eubanks*, 2021 IL 126271, ¶ 47. But, on given facts, "[w]hether a defendant received ineffective assistance of counsel is a question of law that we review *de novo*." *People v. Haynes*, 2024 IL 129795, ¶ 23. In any event, defendant, as the appellant, always has the burden to affirmatively show error. See, *e.g.*, *People v. Jefferson*, 2021 IL App (2d) 190179, ¶ 48.

¶ 73 B. The Ineffective Assistance of Counsel Claim

¶ 74 1. *The Standard for Ineffective Assistance of Counsel*

¶ 75 We follow the familiar two-pronged standard of *Strickland v. Washington*, 466 U.S. 668, 687 (1984), when we address a claim of ineffective assistance of trial counsel. See *People v.*

*Veach*, 2017 IL 120649, ¶ 29 (noting Illinois's adoption of the *Strickland* standard). Under *Strickland*, a defendant must show both (1) counsel acted unreasonably and (2) counsel's unreasonable actions prejudiced the defense. *Strickland*, 466 U.S. at 687. In other words, a "failure by the defendant to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance of counsel." *People v. Peterson*, 2017 IL 120331, ¶ 79.

¶ 76    First, "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight *** and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Because the required evaluation is difficult, the reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"; this is equivalent to saying a defendant must overcome a presumption "the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689.

¶ 77    Second, to show prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 78                                2. *This Case*

¶ 79    On appeal, defendant argues the trial court erred in denying his claim of ineffective assistance of trial counsel. Citing *People v. King*, 316 Ill. App. 3d 901 (2000), he suggests trial counsel's strategy was irrational. Citing *People v. Valentine*, 299 Ill. App. 3d 1 (1998), he implies any examination which opens the door to the defendant's criminal history is unreasonable.

- 16 -

¶ 80    Defendant suggests Skelton's cross-examination made no sense strategically. It was "disjointed," failed to achieve Skelton's stated goal of discrediting H.H., and resulted in testimony favorable to the State. "For example, [Skelton] elicited from H.H. *** that she had been beaten with a leather belt by [defendant]." Furthermore, a strategy which did not risk opening the door to the rape evidence was readily available. He points to multiple places in the record where he suggests counsel could have used a different approach in his cross-examination to discredit H.H.

¶ 81    Defendant also argues the trial court erred in admitting the rape evidence. We need not address this argument, except to note we held on direct appeal the admission was proper. *Hinthorn*, 2016 IL App (4th) 160818, ¶¶ 72, 75. The issue is therefore barred by *res judicata*. See *Huff*, 2024 IL 128492, ¶ 18 (stating issues previously decided on appeal are barred by *res judicata*).

¶ 82    The State first responds the issue is forfeited because defendant's claim is based on the record and thus could have been raised on direct appeal (see *Huff*, 2024 IL 128492, ¶ 18). It further argues, because counsel carefully tread while he was impeaching H.H.'s credibility and carefully crafted his questions in an attempt to not open the door, his cross-examination was not unreasonable.

¶ 83    Initially, we reject the State's argument this claim was forfeited because defendant could have raised it on direct appeal. "When a postconviction petitioner asserts claims that could have been raised on direct appeal, he can avoid the procedural bar of forfeiture by casting his claims as ineffective assistance of appellate counsel for failing to raise the issues on direct appeal." *People v. Williams*, 2024 IL 127304, ¶ 20. Here, defendant properly cast his claim as one of ineffective assistance of appellate counsel. To be sure, the trial court here addressed only the claim of ineffective assistance of trial counsel. But neither party suggests the court erred in so limiting its ruling; we thus address the ruling we have, which relates to trial counsel.

¶ 84　　　　Turning to defendant's argument, we conclude he has failed to affirmatively show the trial court erred in denying his petition. See *Jefferson*, 2021 IL App (2d) 190179, ¶ 48 (stating the appellant has the burden to affirmatively show error). Defendant has, at best, shown counsel's strategy was not ideal. But this is not sufficient. "A defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). Moreover, the cases defendant cites do not support his claim.

¶ 85　　　　At the core of defendant's argument is the proposition defense counsel had no plausible strategic reason to be asking the kind of questions which might open the door to the rape evidence. He argues such questions would relate to H.H.'s fear of defendant and, thus, at best, would elicit prejudicial evidence, such as the testimony defendant had beaten her with a leather belt. He also argues the record indicated counsel had many other options for questions tending to discredit H.H.

¶ 86　　　　This line of reasoning fails to adequately address the independence and the tactical flexibility *Strickland*'s reasonableness standard gives counsel. See *Strickland*, 466 U.S. at 688-89. Defendant implies he can construct from the record a better attack on H.H.'s credibility than the one chosen by counsel. Based on the written record, this argument has a degree of superficial plausibility. But we are not well positioned to evaluate Skelton's choice of tactics. Reviewing courts regularly take note of the deference they must afford to credibility determinations made by triers of fact when the triers of fact can observe a witness's demeanor. See, *e.g.*, *People v. Dorsey*, 2023 IL App (1st) 200304, ¶ 114. Counsel has the same ability to observe a witness's demeanor and can observe the jurors' reaction to the witness's testimony and can thus calibrate tactics based on the jurors' reactions. We therefore must be skeptical of arguments counsel should have

employed a different tactic. See *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.").

¶ 87 Defendant also implies counsel should have employed tactics which did not risk opening the door to the rape evidence; he implies counsel's tactics were too risky. We are not persuaded. Defendant fails to address the principle a flawed strategy is not necessarily an unreasonable one. See *Fuller*, 205 Ill. 2d at 331. Risky tactics are not necessarily irrational tactics; defendant has not shown counsel's tactics crossed the line from risky to irrational.

¶ 88 Defendant cites *King*, 316 Ill. App. 3d at 916, which held, "A defendant can overcome the strong presumption that defense counsel's choice of strategy was *sound* if counsel's decision appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." (Emphasis in original.) *King* is distinguishable. The *King* court held it was irrational for defense counsel to fail to offer evidence to rebut testimony by critical State occurrence witnesses. *King*, 316 Ill. App. 3d at 916. But defendant here challenges *how* counsel chose to attack H.H.'s credibility. Unlike in *King*, counsel did not fail to attack her credibility at all. For the reasons stated above (*supra* ¶¶ 84-87), we are unpersuaded by such *post hoc* challenges to tactics counsel adopted while questioning a witness.

¶ 89 Next, we reject defendant's implication *Valentine* creates a *per se* rule or presumption it is unreasonable for defense counsel to ask any question resulting in the admission of other-crimes evidence. *Strickland* teaches there can be no "checklist" or set of rules determining what constitutes unreasonable assistance; any such set of rules would impermissibly "restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688-89. Thus, we would generally reject a reading of a decision concerning ineffective assistance which appeared to create such a rule.

¶ 90 The holding in *Valentine* does appear to establish a very narrow rule—one with no application here. The *Valentine* court held, where defense counsel chose to question the defendant about an offense the trial court had ruled was usable for impeachment, a "reasonably effective lawyer would have challenged the State's use of *** evidence [of crimes not usable for impeachment] before calling [the] defendant to the witness stand." *Valentine*, 299 Ill. App. 3d at 4. Defendant has not explained the relevance of anything in *Valentine*.

¶ 91 We need not address the trial court's alternative holding defendant was not prejudiced by the admission of the rape evidence. As we have noted, a "failure by the defendant to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance of counsel." *Peterson*, 2017 IL 120331, ¶ 79.

¶ 92 C. The Claim of Unreasonable Postconviction Representation

¶ 93 We now turn to defendant's claim he received unreasonable assistance of postconviction counsel because counsel failed to include in the second amended petition six meritorious "claims" of ineffective assistance of trial counsel which appeared in defendant's *pro se* petition. We disagree.

¶ 94 1. *The Standard for Postconviction Representation*

¶ 95 A defendant who is represented by counsel in proceedings under the Act is entitled to "a 'reasonable' level of attorney assistance." *People v. Johnson*, 2018 IL 122227, ¶ 16. Rule 651(c) sets forth the following duties postconviction counsel must undertake: (1) consult with the defendant by phone, mail, electronic means, or in person, (2) examine the record as needed to shape the defendant's *pro se* claims, and (3) make any amendments necessary for an adequate presentation of the defendant's *pro se* claims. *People v. Custer*, 2019 IL 123339, ¶ 32. The duty to make necessary amendments includes a duty to shape any *meritorious* claim into proper form. See

*Addison*, 2023 IL 127119, ¶ 26 (holding where postconviction counsel determined a claim was meritorious, they had a duty to shape it into proper form). It follows from this counsel must include any meritorious claim in the amended petition. But counsel has no duty to advance a frivolous claim and indeed may be ethically prohibited from doing so. *People v. Urzua*, 2023 IL 127789, ¶ 37.

¶ 96         Compliance with Rule 651(c) is mandatory. *Addison*, 2023 IL 127119, ¶ 21. A proper certificate of compliance from postconviction counsel creates a rebuttable presumption of reasonable assistance. *Addison*, 2023 IL 127119, ¶ 21. The defendant bears the burden of rebutting the presumption of reasonable assistance by showing postconviction counsel did not substantially comply with the requirements of the rule. *Addison*, 2023 IL 127119, ¶ 21. We review *de novo* whether postconviction counsel complied with Rule 651(c). *People v. Mason*, 2016 IL App (4th) 140517, ¶ 19.

¶ 97                              2. *This Case*

¶ 98         Here, counsel filed a certificate in compliance with Rule 651(c). Therefore, it is defendant's burden to rebut the presumption counsel provided reasonable assistance. Defendant argues postconviction counsel failed to comply with Rule 651(c) because he excluded from the amended petition certain ineffective-assistance-of-trial-counsel claims which he asserts were meritorious. He states his *pro se* petition "raised nine separate issues, eight of which involved claims of ineffective assistance of counsel," and a "corresponding number of identical claims against his appellate attorney." But, he says, in the second amended petition, "post-conviction counsel only raised two of [his] claims," while excluding well-plead "claims wherein he argued that trial counsel *** failed to properly impeach the State's witnesses."

¶ 99         Defendant has failed to rebut the presumption counsel provided reasonable

assistance. He asserts the four claims relating to defense counsel's failure to properly impeach State witnesses were meritorious and Rule 651(c) thus required counsel to advance them. Defendant argues at length counsel could have more effectively discredited R.H., H.H., P.H., and J.H. by use of the tactics he describes in four sections of his petition. However, he fails to provide any authority for the proposition the failure to follow these particular tactics—indeed, any particular tactics—was objectively unreasonable. Even at the first stage of postconviction proceedings, a claim of ineffective assistance of counsel can survive only if it sets forth allegations under which "it is arguable that counsel's performance fell below an objective standard of reasonableness." *Tate*, 2012 IL 112214, ¶ 22. At the second stage, defendant had to make a substantial showing counsel's behavior fell below an objective standard of reasonableness. See *Pendleton*, 223 Ill. 2d at 473 (stating the general second-stage standard). Because defendant has not even attempted to offer authority to explain why counsel's failure to use the tactics set out in the *pro se* petition was objectively unreasonable, he has failed to show the claims were meritorious. He has thus failed to show counsel had a duty to advance those claims (*Addison*, 2023 IL 127119, ¶ 26) and therefore has failed to rebut the presumption of reasonable assistance created by postconviction counsel's filing of a Rule 651(c) certificate (*Addison*, 2023 IL 127119, ¶ 21).

¶ 100 Further, even if we overlook the shortcomings in defendant's argument, we nevertheless conclude the claims at issue were not meritorious. As we discussed above, under *Strickland*, counsel is afforded great flexibility in selecting tactics. *Supra* ¶¶ 86, 89. A mere allegation counsel should have employed different tactics does not support a claim counsel acted unreasonably under *Strickland*. Thus, postconviction counsel was under no obligation to include the claims at issue in the amended petition. See *Urzua*, 2023 IL 127789, ¶ 37. Defendant has failed to rebut the presumption postconviction counsel provided reasonable assistance.

¶ 101                        III. CONCLUSION

¶ 102          For the reasons stated, we affirm the trial court's denial of defendant's postconviction petition.

¶ 103          Affirmed.